SLIP OP. 05-65

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____

|                                          |   |                      |
|------------------------------------------|---|----------------------|
| WUHAN BEE HEALTHY CO., LTD.,              | : |                      |
|                                          | : |                      |
| PLAINTIFF,                               | : |                      |
|                                          | : |                      |
| V.                                       | : | COURT NO. 03-00806   |
|                                          | : |                      |
| UNITED STATES,                           | : |                      |
|                                          | : |                      |
| DEFENDANT,                               | : |                      |
|                                          | : |                      |
| AND                                      | : |                      |
|                                          | : |                      |
| SIOUX HONEY ASSOC. AND                   | : |                      |
| AMERICAN HONEY PRODUCERS ASSOC.,         | : |                      |
|                                          | : |                      |
| DEF.-INTERVENORS.                        | : |                      |
|                                          | : |                      |

_____:

[Commerce's Final Determination on honey sustained in part and remanded in part]


Dated: June 10, 2005


*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP* (*Bruce M. Mitchell*, *Jeffrey S. Grimson*, *Adam M. Dambrov*, and *Paul G. Figueroa*) for plaintiff Wuhan Bee Healthy Co., Ltd.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Jeanne E. Davidson*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David S. Silverbrand*) for defendant United States.

*Collier Shannon Scott, PLLC* (*Michael J. Coursey*) for defendant-intervenors Sioux Honey Assoc. and American Honey Producers Assoc.

OPINION AND ORDER

EATON, *Judge*. This action is before the court on a Rule 56.2 motion for judgment upon the

agency record filed by plaintiff Wuhan Bee Healthy Co., Ltd. ("Wuhan"). By its motion, Wuhan

contests certain aspects of the final results of the United States Department of Commerce's

("Commerce") antidumping duty administrative review of honey from the People's Republic of

China ("P.R.C.") for the period December 2001 through May 2002. *See* Honey from the P.R.C.,

68 Fed. Reg. 62,053 (ITA Oct. 31, 2003) (final results) ("Final Results"). The court has

jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).

For the following reasons Commerce's final determination is sustained in part and remanded in

part.

STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."

*Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003)

(quoting 19 U.S.C. § 1516a(b)(1)(B)(I) (2000)). "Substantial evidence is 'such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. at 1374 (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The existence of substantial evidence

is determined "by considering the record as a whole, including evidence that supports as well as

evidence that 'fairly detracts from the substantiality of the evidence.'" *Id.* (citing *Atl. Sugar, Ltd.*

*v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). "As long as the agency's methodology

and procedures are reasonable means of effectuating the statutory purpose, and there is

substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Abbott v. Donovan*, 6 CIT 92, 97, 570 F. Supp. 41, 47 (1983)).

BACKGROUND

When merchandise that is the subject of an antidumping investigation is exported from a nonmarket economy ("NME")[1] country, Commerce determines its normal value by valuing the factors of production utilized in producing the merchandise. Commerce generally values the factors of production by using prices from a market economy country, or surrogate. 19 U.S.C. § 1677b(c)(1). To the extent possible, Commerce is directed to select market economy countries that (1) are at a level of economic development comparable to that of the NME country; and (2) are significant producers of comparable merchandise. 19 U.S.C. § 1677b(c)(4). Commerce is also directed to use "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1).

---

[1] A "nonmarket economy" country is "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority." 19 U.S.C. § 1677(18)(C)(i).

DISCUSSION

I.      *The Tribune* Article

As it has in previous cases, Commerce selected India as the surrogate country for valuing the factors of production. Plaintiff makes no objection to this selection. Wuhan does argue, however, that Commerce erred by valuing the factor of production raw honey based on a March 2000 article entitled, "Apiculture, a Major Foreign Exchange Earner," which appeared in *The Tribune*, a Chandigarh, India newspaper. Wuhan urges as being more probative another article, also from *The Tribune*, entitled, "Honey No Longer a Sweet Business." Wuhan's article appeared in the March 2001 edition of the newspaper.[2]

Commerce maintains that it rejected Wuhan's proffered article for three reasons. First, Commerce contends that the article "appears to be limited to raw honey prices in the [n]orthern part of India, rather than country-wide honey prices." A. R. Doc. 770, Issues and Decision Mem. for the Final Results of the New Shipper Rev. of the Antidumping Duty Order on Honey from the P.R.C. ("Issues and Decision Mem.") at 18. Commerce explains:

> Initially, the 2001 article references only areas located in northern India (that is, Punjab, Himacahl Pradesh, and Haryana) and is only specific to two honey processors in a particular region of India. Moreover, the author of the article is from a northern part of India and is a northern Indian beekeeper. Thus, based upon the evidence upon the record, Commerce found that the article does not fairly represent quality country-wide data.

---

[2]     Wuhan also submitted two honey pricing series, from Jallowal and Tiwana Bee Farms, and defendant-intervenors submitted eleven honey prices from individual companies in India, all of which Commerce rejected. Wuhan's argument as to valuing raw honey, however, focuses solely on the March 2001 article it submitted.

Def.'s Resp., in Opp'n, to Pl.'s Mot. J. Agency R. ("Def.'s Resp.") at 14–15.

Second, Commerce states that "it is not clear whether the raw honey pricing information in respondent's article refers to all raw honey sold in India, or only that sourced from China, Argentina, Germany, and Australia." Issues and Decision Mem. at 18. Commerce maintains that "[t]he plain language of the 2001 Tribune of India article references honey prices sourced from" those countries. Def.'s Resp. at 16.

Finally, Commerce expresses concern about the reliability and quality of the purported facts in the March 2001 article, since some of its information "contradict[s] [Indian] honey import data submitted by petitioners." *Id*. Commerce explains:

> Substantial evidence supports Commerce's finding that import information in the 2001 Tribune of India article is contradicted by actual Indian import data. In particular, the article attributes a statement to Dr. Gill, Chairperson of the northern India Beekeepers Association, that honey imported from China, Argentina, Germany, and Australia arrived in India "at a price varying between Rs 20 to 25 per kgm." However, Indian Export Import Bank Data placed upon the record by petitioners indicates that no honey was imported into India between April 2000 and March 2001 from Argentina, Germany, or China. These statistics undermine the 2001 Tribune of India article's assertion that imports from these countries affected Indian honey prices.

*Id*. (internal citations omitted).

Wuhan first takes issue with Commerce's assertion that the March 2001 *Tribune* article "appears to be limited to raw honey prices in the Northern part of India, rather than country-wide

honey prices."  Issues and Decision Mem. at 18.  Wuhan argues:

> When the words of the article are read in their entirety,
> [Commerce's] interpretation contradicts the record evidence.  The
> person interviewed in the article, Dr. Gill, stated:
>
>> The production cost of honey **in India** is near Rs.
>> 23 per kg and procurement price is only Rs. 24.
>> Honey is procured by private traders.  Moreover,
>> while the production per box in America is near 70
>> kg per year, **in India** it is just 20 to 25 kg.
>
> There is absolutely no rational basis for [Commerce] to suggest
> that Dr. Gill was talking about prices anywhere but "in India."  He
> did **not** say, "in *my part of* India" or "in *Northern* India."
> [Commerce's] conclusion that it "appears" that Dr. Gill's pricing
> information was "limited to raw honey prices in the Northern part
> of India, rather than country-wide honey prices" is completely
> contradicted by the record.

Br. Supp. Pl.'s R. 56.2 Mot. J. Agency R. ("Pl.'s Br.") at 10 (internal citation omitted) (emphases

in original).

        Next, Wuhan disputes Commerce's contention that "it is not clear whether the raw honey

pricing information in respondent's article refers to all raw honey sold in India, or only that

sourced from China, Argentina, Germany, and Australia."  Issues and Decision Mem. at 18.  The

article states in relevant part:

> Dr. Madhu Gill, Chairperson of the Northern India Beekeepers
> Association[,] says that the honey from China, Argentina,
> Germany, [and] Australia is landing in the country at a price
> varying between Rs 20 to 25 per kg.  It has affected the bee-
> keepers in a big way.  The production cost of honey in India is near
> Rs 23 per kg and procurement price is only Rs 24.

A. R. Doc. 473, Pl.'s Ex. 4.  Wuhan maintains that the article makes clear which honey Dr. Gill

was referring to when discussing prices. Wuhan explains:

> A plain reading of the article demonstrates that this is "not clear"
> only if the actual words of Dr. Gill in the article are ignored. Dr.
> Gill discussed import prices "landing in the country at a price
> varying between Rs 20 to 25 per kg." He then stated that the
> "production cost of honey in India is near Rs 23 per kg and the
> procurement price is only Rs 24." This is in a different sentence as
> Dr. Gill's discussion of the imports. . . . Dr. Gill's point regarding
> price depression caused by imports only makes sense if the price
> range of the imports (Rs. 20 to 25/kg) is contrasted with the
> procurement prices "in India" (Rs. 24/kg). This reading is
> consistent with Dr. Gill's point (and the title of the article[,]
> "Honey No Longer a Sweet Business") since it demonstrates that
> imported honey could undercut Indian honey by up to Rs 4/kg.

Pl.'s Br. at 12 (internal citations omitted) (emphasis in original).

Finally, with respect to Commerce's stated concerns about the reliability and quality of

the March 2001 article, Wuhan claims that Commerce "ignored record evidence that fairly

detracted from this conclusion . . . ." *Id*. at 13. Wuhan explains that it

> submitted official export statistics from China and Germany
> showing that both of those countries did, in fact, export honey to
> India during the period preceding the March 2001 article. If
> [Commerce] had considered this evidence, then the record would
> have confirmed Dr. Gill's statement as to honey from three of four
> foreign sources.

*Id*.

In addition to disputing Commerce's stated reasons for rejecting the March 2001 *Tribune*

article, Wuhan further argues that Commerce should have accepted that article, instead of the

March 2000 article, because the March 2001 article is more contemporaneous with the period of

review (December 2001 through May 2002) (the "POR"). Wuhan maintains that Commerce's

rejection of the March 2001 article, despite its contemporaneity with the POR, was contrary to

Commerce's "practice to use data that are the most contemporaneous with the POR when

selecting from two or more equally valid surrogate values." *Id*. at 15 (citing Sebacic Acid From

the P.R.C., 65 Fed. Reg. 49,537 at Issue 9 (ITA Aug. 14, 2000) (final results)).

Here, the court finds sufficient evidence to support Commerce's rejection of Wuhan's

article. First, although it might appear from the wording of the article that Dr. Gill was referring

to honey prices in India generally, the article itself references only areas located in northern India

and specifically mentions only two honey processors, both located in a particular region of India.

For Commerce to conclude that prices from other parts of India would be mentioned if Dr. Gill

were really referencing prices from the whole country is a reasonable inference. *See Hebei

Metals & Minerals Import & Export Corp. v. United States*, 29 CIT __, __, slip op. 05-32 at 14

(Mar. 10, 2005) ("Commerce's general mandate . . . to calculate normal value as accurately as

possible on the basis of the best available information . . . . allows Commerce to draw reasonable

inferences from the record . . . ."). Moreover, the author of the article is from the northern part of

India and is a northern Indian beekeeper. A. R. Doc. 473, Pl.'s Ex. 4. Second, Commerce is also

justified in finding that it is not clear whether the article's pricing information "refers to all raw

honey sold in India, or only that sourced from China, Argentina, Germany, and Australia." Def.'s

Resp. at 16 (citing Issues and Decision Mem. at 18). It is indeed unclear how Dr. Gill arrived at

a procurement price of Rs. 24 and this lack of clarity is compounded by the reference to selected

countries. Though the information conveyed may be in two separate sentences, the sentences are

part of a three-sentence string of related, if confusing, information. Finally, Commerce provided evidence tending to show that the prices stated in the article were not reliable. In particular, Commerce found that "no honey was imported into India between April 2000 and March 2001 from Argentina, Germany, or China" and that "these same statistics also contradict the landed prices referenced in the 2001 article." Def.'s Resp. at 17 (citing A. R. Doc. 510, Ex. 2). Although Wuhan produced evidence tending to call some of these facts into question, it is not sufficient to overcome the totality of the evidence cited by Commerce of the proffered article's lack of utility.

Based on this evidence, the court finds that Commerce reasonably determined that the article submitted by Wuhan was not the best available source for country-wide data. Finally, Wuhan has not provided any affirmative evidence to show that the March 2001 article it placed on the record is more country-wide or more reliable than the March 2000 article. Where there exists on the record "alternative sources of data that would be equally or more reliable . . . it is within Commerce's discretion to use either set of data." *Geum Poong Corp. v. United States*, 26 CIT 322, 326, 193 F. Supp. 2d 1363, 1369 (2002). Thus, the court finds that Commerce is justified in using the March 2000 article to value raw honey.

II.     Commerce's Use of Inflator

In addition to the March 2001 *Tribune* article, Wuhan submitted two pricing series for valuing raw honey: one from Jallowal, and the other from Tiwana Bee Farms. Commerce

rejected both pricing series for valuing raw honey because they did not represent country-wide

prices. Nevertheless, Commerce relied on the pricing series to calculate the necessary inflator[3]

for valuing raw honey. As Commerce explained in its Issues and Decision Memorandum:

> Specifically, we relied on the [wholesale price index, or "WPI"] as an inflator for those months when the WPI was representative of inflation of raw honey in India (i.e., to December 2001, the first month of the POR). For those months when the WPI was not representative of raw honey inflation in India, we instead applied as the monthly inflator the average monthly price increase (percentage) of the raw honey prices submitted by respondent (i.e., average of the POR monthly raw honey purchase prices from the Tiwana and Jallowal Bee Farms).

Issues and Decision Mem. at 19. Wuhan argues that Commerce's "use of the Jallowal and

Tiwana Bee Farms' data to adjust the surrogate value for raw honey cannot be reconciled with its

rejection of that same data as not 'country-wide.'" Pl.'s Br. at 19. In other words, Wuhan argues

that Commerce cannot reject the pricing series as not "country wide" for one purpose, yet use the

same pricing series for another purpose where country-wide data would also be preferred.


Commerce maintains that "the Jallowal and Tiwana Farms pricing information, though

limited to a particular region of India, demonstrates conclusively that raw honey prices increased

during several months of the POR." Def.'s Resp. at 23. Commerce explains that "record

information submitted by respondent clearly indicate[s] that inflating the March 2000, *Tribune of

India* price data only by the WPI does not appropriately reflect the significant increase in Indian

raw honey prices during the POR." Issues and Decision Mem. at 19. Commerce further points

---

[3] Because the prices from the March 2000 article correlate to a period prior to the POR, Commerce used an inflator to calculate the raw honey price during the POR.

out that the Jallowal and Tiwana Bee Farms data supplied "the only documented raw honey

values from actual Indian producers on the record completely contemporaneous with the POR."

*Id*. Thus, Commerce states, that information constitutes the best available information for

inflating the average raw honey value.

Commerce further maintains that it is not precluded from rejecting this data for one

purpose, while using it for another:

> Wuhan has not cited to any statutory, regulatory, or judicial
> authority providing that Commerce is precluded from using
> submitted company-specific pricing information to calculate a <u>rate</u>
> of increase simply because Commerce determined that this same
> information was not suitable for use as the underlying surrogate
> values. In adhering to its mandate to calculate dumping margins as
> accurately as possible, Commerce could not ignore the significant
> rate at which Tiwana's and Jallowal's documented raw honey
> purchase costs increased during the POR.

Def.'s Resp. at 24 (emphasis in original)

Commerce is given broad discretion "to determine margins as accurately as possible, and

to use the best information available to it in doing so." *Lasko Metal Prods., Inc. v. United States*,

43 F.3d 1442, 1443 (Fed. Cir. 1994). Here, the Jallowal and Tiwana Bee Farms data indicated

that raw honey prices increased at a significantly greater rate during the POR than did the WPI.

Because this data was the only information on the record demonstrating the extent to which

prices had increased, it was therefore the best available information. Moreover, Commerce's

decision to reject the Jallowal and Tiwana Farms data for use in calculating the surrogate value

for raw honey was based on separate criteria from its decision to use the data to calculate the

inflator. In the absence of any other pertinent information on the record, the court finds

reasonable Commerce's decision to use the Jallowal and Tiwana Farms data for this limited

purpose.

III.    Commerce's Use of MHPC's Financial Statements

        A.      Commerce's Decision to Use MHPC's Financial Statement

        Next, Wuhan argues that Commerce's decision to reject the financial statement of Coorg

Honey and Wax Producers Cooperative ("Coorg") and instead use that of Mahabaleshwar Honey

Producers' Cooperative ("MHPC") was not the best available information. Commerce had two

financial statements on the record to choose from to supply the surrogate values for factory

overhead; selling, general, and administrative expenses; and profit ratios. The first was MHPC's

2001-2002 financial statement; the second was Coorg's 2001-2002 financial statement. Both of

the financial statements were audited. In its Issues and Decision Memorandum, Commerce

explained why it rejected the Coorg statement:

> While Coorg's financial statement is contemporaneous with the POR, we find that it is not the best information in terms of quality or specificity. . . . In particular, we note that the Auditor's Report prefacing Coorg's financial statement identifies the absence of critical information not available for auditing purposes such as governmental loans and subsidies, and discrepancies between specific funds noted in the Auditor's Report and funds listed in Coorg's financial statements. Moreover, because MHPC's financial data is based on subject merchandise while Coorg's financial data includes a significant amount of non-subject merchandise, we find that MHPC's financial data is more reliable.

Issues and Decision Mem. at 27.

Wuhan first argues that Commerce's "conclusion that Coorg's financial statement was unreliable because of accounting discrepancies noted by Coorg's auditor ignores the fact that Coorg's auditor gave the company an 'A class' rating – the same rating granted to MHPC, the company whose financial data [Commerce] deemed to be 'more reliable.'" Pl.'s Br. at 23. Wuhan maintains that the problems cited by Coorg's auditor are "far from being the types of discrepancies that would render a financial statement unreliable (especially one that received an "A class" rating) . . . ."[4] *Id.* at 24. Wuhan further argues that while Commerce cites discrepancies between specific funds noted in the Auditor's Report and funds listed in Coorg's financial statements, it "provides absolutely no explanation of what those funds are or why such a discrepancy, if it exists, would render the Coorg financial statement unusable."[5] *Id.* at 24–25.

Next, Wuhan claims that Commerce's finding that the usefulness of Coorg's financials was diminished by the inclusion of a significant amount of non-subject merchandise "is based on a misleading argument made by the petitioners below, rather than substantial evidence on the record." *Id.* at 25. As Wuhan's counsel explained at oral argument:

---

[4]     These problems include:
1.     In many members' accounts, the member's specimen signature and his nominee's name was not taken.
2.     Share letters to members were not given.
3.     Confirmation letter regarding Balance of Payment to board was not obtained.
4.     Entire welfare fund was not deposited.

A.R. Doc. 603, Ex. 3 ¶7.

[5]     Specifically, one of the funds listed in the auditor's report, the Depreciation Fund, is not found in Coorg's financial statement.

> They [petitioners] say that only 55 percent of Coorg sales come
> from honey. That's extremely misleading when you look at the
> way they came up with that calculation. They blew out sales
> through two branches of Coorg [Nagra and Gonigappal]. . . . they
> pulled them out because the auditor's letter mentioned that sales
> through one of these branches included some steel products. . . .
> But when you look at what Coorg buys, only ten percent of its
> purchases were bullets and cutting instruments. So to completely
> blow out all honey sales through two branches is really not fair. If
> you add those back in, 95 percent of Coorg's revenue comes from
> honey, 95 percent.

*Id*. (internal citation omitted). In other words, given the low percentage of steel products

purchased (10%), Wuhan maintains that significantly more than 55% of Coorg's sales would

come from honey (Wuhan estimates 95%). In its papers, Wuhan makes similar observations

concerning the methodology defendant-intervenors use to support their argument that the sales

through Coorg's Nagra branch consisted of steel products:

> [P]etitioners subtracted Rs. 1,083,598.30 from Coorg's total sales
> of Rs. 4,821,847.50. Whether it is reasonable to assume, as
> petitioners did, that all product sold through the Nagra branch was
> product other than honey, can be tested by Coorg's financial data.
> According to Coorg's purchases appearing on its 2001-2002
> income and expenses schedule, only 10% of Coorg's purchases of
> all raw materials consisted of anything that could possibly be
> deemed to be "steel." In addition, only 2.6% of Coorg's sales
> consisted of these same items. Yet Coorg's sales through the
> Nagra Branch represented 22.5% of Coorg's total sales. This
> demonstrates that it is not reasonable to assume, as [did] the
> petitioners and [Commerce], that all sales through . . . Coorg's
> Nagra Branch must consist of "steel products."

*Id*. at 26 (internal citations omitted) (emphases in original). Wuhan then urges a recalculation:

"When the Nagra Branch sales and the Gonigappal Branch sales are added back in, then the

record reflects that 95.5%[6] of Coorg's business consists of honey-related activities. Therefore, [Commerce's] conclusion that Coorg's data 'includes a significant amount of non-subject merchandise' is not supported by the record." *Id*. at 27. Moreover, Wuhan claims that its conclusion should have led Commerce to choose the Coorg financials over that of MHPC:

> When compared with MHPC, the company [Commerce] selected, Coorg's percentage of honey-related business is much higher. According to MHPC's financial statement, honey-related activity represented only 55% of MHPC's total sales. The other 45% comes from "fruit canning." Yet, [Commerce] concluded that . . . MHPC's financial data is more reliable. However, [Commerce's] conclusion does not square with the record evidence, which shows that MHPC's honey operations contributed only 55% to MHPC's total sales, a far lower number than Coorg's 95.5 percent.

*Id*. at 27–28.

Initially, Commerce maintains that it "properly identified and documented the existence of unexplained accounting irregularities in COORG's financial statements," and determined that the irregularities "undermined the reliability of COORG's financial statements." Def.'s Resp. at 27. These "irregularities" include the absence of information needed by the auditor, such as the amount of governmental loans and subsidies and discrepancies between specific funds noted in the Auditor's Report and funds listed in Coorg's financial statements. *See* Issues and Decision Mem. at 27.

---

[6]     Wuhan arrived at this figure by subtracting the sales income that Coorg received for "22 gun bullets" (13,175 Rs), "12 bore gun bullets" (111,708 Rs), "cutting instruments" (225 Rs), and "fertilizers" (88,483 Rs) (totaling 213,591), from the amount of total sales (4,821,847.50 Rs), to obtain a figure of 4,608,256.50 Rs. *See* Pl.'s Br. at 25–26. It then divided that number by total sales, resulting in a percentage figure of 95.5%. *See* A. R. Doc. 603, Ex. 3.

With respect to Commerce's finding that Coorg's financial data contained a significant

amount of non-subject merchandise, Commerce explains:

> This conclusion is consistent with Commerce's normal practice,
> which favors the use of financial data to calculate SG&A and
> profits "that are more narrowly limited to a producer of comparable
> merchandise than data based on a producer of a wider range of
> products when the former data are available." Wuhan seeks to
> discredit Commerce's use of MHPC's financial data by pointing
> out that MHPC also produces non-subject merchandise. Although
> . . . MHPC produces non-subject merchandise, Wuhan fails to
> reveal that MHPC segregates profits and losses in its financial
> statements by product line. . . . Thus, Commerce's surrogate profit
> calculation only uses the relevant financial information derived
> from MHPC's honey operations.

Def.'s Resp. at 28–29 (internal citations omitted).


The antidumping statute "grants Commerce broad discretion to determine the 'best

available information' in a reasonable manner on a case-by-case basis." *Peer Bearing Co. v.*

*United States*, 25 CIT 1199, 1208, 182 F. Supp. 2d 1285, 1298 (2001) (internal citation omitted).

Commerce has explained that its normal practice is to select, where available, data from

producers of comparable merchandise over data from producers of a wider range of products.

*See* Issues and Decision Mem. for Synthetic Indigo from the P.R.C., 65 Fed. Reg. 25,706 at

Comment 6 (ITA May 3, 2000) (final determination). Here, Commerce was justified in finding

that Coorg's financial statement was not the best available information on the record. First,

Coorg's financials contained irregularities such as missing information (the "Depreciation

Fund") and discrepancies with the auditor's report ("Entire welfare fund not deposited"). Next,

although both MHPC and Coorg derived income from non-subject merchandise, only MHPC's

financial statement separately accounted for the income and expenses related to the non-subject merchandise, by segregating it from the subject merchandise. Thus, even if Plaintiff's recalculation were to be accepted, 5% of Coorg's income would be derived from non-subject merchandise, whereas using MHPC's financials, 100% of income would be from raw honey. *See* A. R. Doc. 503. Thus, Commerce was justified in finding MHPC's financial statement to be more reliable that Coorg's, since Coorg's financials contained irregularities that MHPC's did not, and MHPC's financial statement allowed Commerce to derive profit using only the financial information relevant to honey operations.


B.      Commerce's Adjustment of MHPC's Profit Figures

Next, Wuhan argues that "[e]ven if it was lawful to use the MHPC financial data, [Commerce] erred in ignoring the company's stated profit and relying, instead, on a hypothetical calculation to arrive at a profit figure 600% higher than realized by MHPC." Pl.'s Br. at 31. In its Final Results, Commerce explained its reasoning:

> [T]he net profit value listed in MHPC's financial statement appears to reflect a disbursement of gross profit and accruals recorded in a special profit and loss "reserve account," indicating that the amounts recorded in this account are not actual expenses. Inclusion of these amounts from the profit and loss "reserve account" in our profit calculation would cause us to understate MHPC's actual profit for its honey processing operations.

Issues and Decision Mem. at 28.


Wuhan makes two main arguments against Commerce's methodology. First, it argues that Commerce's

> decision to ignore MHPC's stated net profit in favor of a
> hypothetical construct runs contrary to past determinations of
> [Commerce]: "[i]n calculating overhead and SG & A, it is
> [Commerce's] practice to accept data from the surrogate
> producer's financial statements in toto, rather than performing a
> line-by-line analysis of the types of expenses included in each
> category."

Pl.'s Br. at 32–33 (internal citation omitted).  Second, Wuhan argues that Commerce's decision

to exclude the "reserve account" from its profit calculation "runs contrary to its conclusion that

MHPC's data is 'reliable.'"  *Id*. at 33.   Wuhan explains:

> Nowhere did MHPC's auditors complain that, under Indian
> Generally Accepted Accounting Principles ("GAAP"), deducting
> reserves from gross profit prior to calculating net profit is either
> inappropriate or prohibited.  There is no mention of such reserves
> from prior years being spent during the 2001-2002 period in a
> manner not in accordance with Indian GAAP or that would distort
> the company's financial picture.

*Id*. at 34.


For its part, Commerce maintains that while it prefers not to engage in a line-by-line

evaluation of overhead accounts, "nothing in [the two Commerce determinations cited by

Wuhan][7] indicates [that] Commerce may not undertake such an analysis of <u>profit</u> accounts if it

has reason to do so."  Def.'s Resp. at 31 (emphasis in original).

---

[7]     Wuhan cites the Issues and Decision Mem. for Pure Magnesium in Granular Form
From the P.R.C., 66 Fed. Reg. 49,345 (ITA Sept. 27, 2001) (final determination), as evidence of
Commerce's past practice: "In calculating overhead and SG & A, it is the Department's practice
to accept data from the surrogate producer's financial statements in toto, rather than performing a
line-by-line analysis of the types of expenses included in each category." *Id*. at Comment 4.
Wuhan further cites Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From
the P.R.C., 67 Fed. Reg. 45,451, 45,452 (ITA July 9, 2002) (prelim. results), in which Commerce
explains that it uses surrogate companies' "reported profit," rather than imposing a profit figure.

Commerce "has broad authority to interpret the antidumping statute." *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997). "[T]he critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001). Here, Commerce reasonably determined that the amounts recorded in the "reserve account" were not actual expenses and, therefore, including them in its profit calculation would result in an understated profit figure for MHPC's honey processing operations. Although Wuhan cites several determinations indicating that it is not Commerce's practice to undertake an item-by-item analysis of overhead, it cites no such restrictions on Commerce's decision to analyze profit figures and make a single adjustment, nor does it otherwise claim that MHPC's financials are unreliable. Therefore, the court finds that it was reasonable for Commerce to recalculate MHPC's profit based its examination of the financials.

IV.      Coal Prices

Finally, Wuhan contends that Commerce should have used domestic Indian coal prices for "non-coking steam coal" published in the TERI Energy Data Directory and Yearbook for 2000/2001 ("Teri Data"). Commerce instead used Indian import values, which included charges for the international freight required to ship the coal to India. In objecting to this data, Wuhan explains:

> [The TERI data] provided local prices as of April 20, 2000 for
> various grades of non-coking coal from regions throughout India.
> Despite . . . this published and comprehensive pricing information

> on the record . . . Commerce opted to value coal using Indian
> import values for a basket category of coal products taken from the
> Monthly Statistics of the Foreign Trade of India ("MSFTI"). This
> import value, which included international freight from the
> exporting countries to India, was *twice as high* as the average
> domestic price for non-coking coal reported in the TERI Energy
> Data Directory.

Pl.'s Br. at 36. Wuhan also disputes Commerce's characterization of the Teri Data as being derived from a single producer in India. Wuhan maintains that "[t]he Teri Data reflects prices for 11 subsidiaries of Coal India Ltd. located in almost every state of India. Consequently, Commerce's conclusion that the Teri Data does not represent a country-wide price is not supported by the record." *Id*. at 39. Wuhan relies on the Court's decision in *Yantai Oriental Juice Co. v. United States*, 26 CIT 605 (2002) (not reported in the Federal Supplement), to support its position that Commerce should have used the Teri Data instead of an imported value. In *Yantai*, the Court determined that it

> cannot find Commerce's conclusion that imported steam coal data
> is the "best available information" is supported by the record
> because: (1) there is no indication that the domestic Indian coal
> market was distorted . . . such that the use of import data was
> preferred; and (2) there is no indication that the use of imported
> coal values "best approximate the cost incurred" for Indian [subject
> merchandise] production.

*Id*. at 617.

Commerce contends that "[t]he <u>Yantai</u> decision does not stand for the proposition that Commerce can never rely upon imported coal prices for purposes of its NME surrogate valuations. Rather, <u>Yantai</u> states that Commerce must explain why the use of import prices is more accurate than the use of domestic coal prices." Def.'s Resp. at 32. Commerce also states

that it specifically considered but rejected the Teri Data because it "is derived from a single producer in India, CIL [Coal India Ltd.]."  Issues and Decision Mem. at 31.

Commerce is correct that *Yantai* requires it to explain why the use of imported coal prices best approximates the actual coal costs incurred by the Indian surrogate.  However, the court finds that Commerce has failed to adequately explain its reasoning here.  First, Commerce determined that the MSFTI data was the best available information to value coal because "it is quality, country-wide data specific to steam coal prices imported into India during the POR, and is representative of competitive market prices."  *Id*.  Yet, there is no reason given as to why imported coal provides the best surrogate value.  In addition, it appears that Wuhan is correct that many regions of India are represented in the Teri Data.[8]  Thus, Commerce has not demonstrated that the value used is the best available information or that the Teri Data is unrepresentative of competitive market prices throughout India.  Although the court is mindful that Commerce does not have an "unconditional preference" for using domestic prices over import prices when valuing surrogates, on remand, it must provide an explanation that reasonably supports its decision. *See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT __, __, slip op. 05-32 at 11 (Mar. 10, 2005) (ordering Commerce to either "adhere to its conditional preference for domestic surrogate data or . . . state that it is deviating from this practice and

---

[8]        The Teri Data classifies "[n]on-coking coal produced in all states other than Assam, Arunachal Pradesh, Meghalaya, and Nagaland."  A. R. Doc. 473, Pl.'s Br. Ex. 4.  There are a total of 25 states in India.  The Teri Data also contains a chart representing the "[s]elling price of coal in . . . the CIL (Coal India Ltd.) and subsidiaries."  *Id*.  According to a map provided on CIL's Web site, CIL's subsidiaries are located in various regions of India, including the states of Jharkhand, Madhya Pradesh, Orissa, Assam, and West Bengal.  *See* www.coalindia.nic.in (last visited May 25, 2005).

provide a rational explanation for doing so.").

CONCLUSION

For the foregoing reasons, the court remands this action to the Department of Commerce

for further action with respect to its decision to value coal using Indian import values.

Remand results are due on September 8, 2005, comments are due on October 10, 2005,

and replies to such comments are due on October 21, 2005.

/s/ Richard K. Eaton
Richard K. Eaton

Dated: June 10, 2005
       New York, New York