Slip Op. 09-61

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                               :
ZHEJIANG NATIVE PRODUCE AND     :
ANIMAL BY-PRODUCTS IMPORT &     :
EXPORT GROUP CORP., JIANGSU      :
KANGHONG NATURAL HEALTHFOODS    :
CO., LTD., AND ANHUI HONGHUI     :
FOODSTUFF (GROUP) CO., LTD.,     :
                               :   Before: Richard K. Eaton, Judge
                               :
                               :   Court No. 06-00234
          Plaintiffs,           :
                               :
     v.                        :
                               :
                               :
UNITED STATES,                  :
                               :
          Defendant,            :
                               :
     and                       :
                               :
THE AMERICAN HONEY PRODUCERS    :
ASSOCIATION AND THE SIOUX       :
HONEY ASSOCIATION,              :
                               :
          Def.-Ints.            :
_____:
```

OPINION

[United States Department of Commerce's Final Results of Redetermination are sustained.]

Dated: June 19, 2009

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP* (*Bruce M. Mitchell*, *Ned H. Marshak, Elaine F. Wang*), for plaintiffs.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Reginald T. Blades, Jr.*, Assistant Director, United States Department of Justice Commercial Litigation Branch, Civil Division,(*Jane C. Dempsey*); Office of the Chief Counsel for Import Administration, United States Department of Commerce, (*Sapna Sharma*), of counsel, for defendant.

*Kelley Drye & Warren* (*Michael J. Coursey*, *R. Alan Luberda*), for defendant-intervenors.


Eaton, Judge:  In *Zhejiang Native Produce and Animal By-Products Import & Export Group Corp. v. United States*, 32 CIT __, Slip Op. 08-68 (June 16, 2008) (not reported in the Federal Supplement) ("*Zhejiang I*"), this court sustained, in part, and remanded the final results of the United States Department of Commerce's ("Commerce" or the "Department") third administrative review of the antidumping duty order on honey from the People's Republic of China ("PRC") for the period of review ("POR") beginning on December 1, 2003 through November 30, 2004.  *See* Honey from the PRC, 71 Fed. Reg. 34,893 (Dep't of Commerce June 16, 2006) (final results) and the accompanying Issues and Decision Memorandum (Dep't of Commerce June 9, 2006) ("Issues & Dec. Mem.") (collectively, "Final Results").

Commerce has now issued the Final Results of Redetermination Pursuant to Court Remand (Dep't of Commerce Dec. 18, 2008) ("Remand Results").  Plaintiffs Zhejiang Native Produce and Animal By-Products Import & Export Group Corp., Jiangsu Kanghong Natural Healthfoods Co., Ltd., and Anhui Honghui Foodstuff (Group) Co., Ltd. (collectively, "plaintiffs") have filed their comments in response to the Remand Results.  *See* Pls.' Comments Resp. Remand Results ("Pls.' Comments").  In addition, Commerce has filed its response to those comments, and defendant-

intervenors the American Honey Producers Association and the

Sioux Honey Association have filed their respective responses, as

well.  *See* Def.'s Resp. Pls.' Comments ("Defs.' Resp."); Def.-

Ints.' Comments Remand Results ("Def.-Ints.' Comments").

Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) and 19

U.S.C. § 1516a(a)(2)(B)(iii).  As explained in *Zhejiang I*,

certain of the issues in this action have been litigated

previously in this Court.[1]  *Zhejiang I*, 32 CIT at __, Slip Op.

08-68 at 3.  For the reasons set forth below, the court sustains

the Remand Results.


STANDARD OF REVIEW

The court reviews the Remand Results under the substantial

evidence and in accordance with law standard set forth in 19

U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful

any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise

---

[1]     These include:  a challenge to Commerce's second
administrative review of the antidumping duty order on Chinese
honey (for the period of review from December 1, 2002 through
November 30, 2003) in *Shanghai Eswell Enter. Co. v. United
States*, 31 CIT __, Slip Op. 07-138 (Sept. 13, 2007) (not reported
in the Federal Supplement) and in *Wuhan Bee Healthy Co. v. United
States*, 31 CIT __, Slip Op. 07-113 (July 20, 2007)(not reported
in the Federal Supplement); and a challenge to Commerce's first
administrative review of the antidumping duty order on Chinese
honey (for the period of review from December 1, 2001 through May
31, 2002) in *Wuhan Bee Healthy Co. v. United States*, 29 CIT 587,
374 F. Supp. 2d 1299 (2005).

not in accordance with law . . . .").


DISCUSSION

I.  Calculation of Surrogate Values

In determining whether the subject merchandise is being, or

is likely to be, sold at less than fair value, 19 U.S.C.

§ 1677b(a) requires Commerce to make "a fair comparison . . .

between the export price[2] or constructed export price[3] and normal

value."   When merchandise that is the subject of an antidumping

investigation is exported from a nonmarket economy ("NME")[4]

---

[2]    The "export price" is "the price at which the subject
merchandise is first sold . . . by the producer or exporter of
the subject merchandise outside of the United States to an
unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States," as adjusted.  19
U.S.C. § 1677a(a).

[3]    "Constructed export price" is "the price at which the
subject merchandise is first sold . . . in the United
States . . . by or for the account of the producer or exporter of
such merchandise or by a seller affiliated with the producer or
exporter, to a purchaser not affiliated with the producer or
exporter," as adjusted.  19 U.S.C. § 1677a(b).

[4]    A "nonmarket economy country" is "any foreign country
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480,
481, 318 F. Supp. 2d 1339, 1341 (2004).  Therefore, because the
subject merchandise comes from the PRC, Commerce constructed
normal value by valuing the factors of production using surrogate

(continued...)

country, such as the PRC, Commerce, under most circumstances,

determines normal value by valuing the factors of production used

in producing the merchandise using surrogate data, to which it

adds

> an amount for general expenses and profit
> plus the cost of containers, coverings, and
> other expenses. . . .[T]he valuation of the
> factors of production shall be based on the
> best available information regarding the
> values of such factors in a market economy
> country or countries considered to be
> appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1).


A.    Calculation of Surrogate Financial Ratios: Expenses for
      Jars and Corks

In determining normal value, Commerce uses ratios[5] to

---

[4](...continued)
data from India.  *See* 19 U.S.C. § 1677b(c)(4).

[5]    As this Court has explained:

> [t]o calculate the SG&A ratio, the Commerce
> practice is to divide a surrogate company's
> SG&A costs by its total cost of
> manufacturing.  For the manufacturing
> overhead ratio, Commerce typically divides
> total manufacturing overhead expenses by
> total direct manufacturing expenses.
> Finally, to determine a surrogate ratio for
> profit, Commerce divides before-tax profit by
> the sum of direct expenses, manufacturing
> overhead and SG&A expenses.  These ratios are
> converted to percentages ("rates") and
> multiplied by the surrogate values assigned
> by Commerce for the direct expenses,
> manufacturing overhead and SG&A expenses.

(continued...)

calculate amounts for "general expenses and profit," calculating

separate values for selling, general and administrative expenses;

manufacturing overhead; and profit.  *See Wuhan Bee Healthy Co. v.*

*United States*, 31 CIT __, __, Slip Op. 07-113 at 41-42 (July 20,

2007) (not reported in the Federal Supplement) (citation and

quotation omitted); 19 U.S.C. § 1677b(c)(1)(B).

In the Final Results, Commerce did not include expenses for

jars and corks as direct material costs in the calculation of the

materials, labor and energy ("MLE") denominator in the

Department's financial ratio calculations.  *See Zhejiang I*, 32

CIT at ___, Slip Op. 08-68 at 30-31; Remand Results at 2.[6]

Commerce stated that the financial statements of the

Mahabaleshwar Honey Producers' Cooperative ("MHPC")[7] indicated

---

[5](...continued)
*Wuhan Bee Healthy Co. v. United States*, 31 CIT __, __, Slip Op.
07-113 at 42 n.15 (July 20, 2007) (not reported in the Federal
Supplement) (citing *Shanghai Foreign Trade Enters. Co. v. United
States*, 28 CIT 480, 482, 318 F. Supp. 2d 1339, 1341 (2004)).

[6]     In the calculation of surrogate financial ratios, the
denominator should include the expenses of all direct material
costs.  *See* Persulfates from the PRC, 68 Fed. Reg. 6,712 (Dep't
of Commerce Feb. 10, 2003) (notice of final results), and
accompanying Issues and Decision Memorandum, at Comm. 9 (Dep't of
Commerce Feb. 3, 2003).

[7]     In the Final Results, Commerce determined that the
information from the 2004-2005 financial statements of the MHPC
was "the best and most contemporaneous available information for
valuing the financial ratios."  Issues & Dec. Mem. at 19
(footnote omitted).  The court upheld Commerce's determination to
use the MHPC financial statements in *Zhejiang I*.  *See* 32 CIT at
___, Slip Op. 08-68 at 25.

that these items were being purchased and sold by MHPC, rather than being consumed in the sale of honey: "Respondents failed to provide evidence that the 'jars and corks' were consumed as packing[8] in the manner described."  Issues & Dec. Mem. at 23.

The court in *Zhejiang I* found no reason to deviate from its finding in *Shanghai Eswell* with regard to this issue.[9]  *Zhejiang I,* 32 CIT at __, Slip Op. 08-68 at 32-33 (citing *Shanghai Eswell Enter. Co. v. United States*, 31 CIT __, Slip Op. 07-138 at 24-25

---

[8]    The Department refers to "packing" and "packaging" interchangeably.  It is not clear to the court that the words, as used in MHPC's financial statements, are necessarily referring to the same thing.

[9]        First, the court observes . . . that the chart specifically pertains to honey sale and collection.  Next, the court notes that the chart contains line items for 250 gram, 500 gram and 1 kilogram jars; 53 millimeter and 38 millimeter corks; and honey machines in both the "Sale" column and the "Purchase" column.  The line item for 100 gram jars appears only in the "Sale" column.  The chart is therefore ambiguous.  While it is possible that MHPC buys and sells jars [with] corks that are either empty or filled with something other than honey, there is no evidence in the MHPC financial statement tending to support such a conclusion.  Without further explanation the court cannot accept as adequate Commerce's reliance solely on the line items for jars and corks being separate from other line items, to support its conclusion that they are not direct materials associated with finished honey.

*Zhejiang I,* 32 CIT at ___, Slip Op. 08-68 at 32-33 (citing *Shanghai Eswell Enter. Co. v. United States*, 31 CIT __, Slip Op. 07-138 (Sept. 13, 2007) (not reported in the Federal Supplement)(citations and footnote omitted)).

(Sept. 13, 2007) (not reported in the Federal Supplement)

("*Shanghai Eswell*")).  The court thus rejected as unsupported by

substantial evidence Commerce's findings regarding expenses for

jars and corks and remanded this question to Commerce.  *Id*. at

__, Slip Op. 08-68 at 33.

In its Remand Results, Commerce states:

> In accordance with the Court's instruction,
> and after careful examination of the record,
> and consistent with the Department's finding
> in the *Shanghai Eswell* Remand, as affirmed by
> the Court, the Department has revised the
> financial ratio calculations to include
> MHPC's reported expenses for jars and corks
> as direct materials used to produce finished
> honey.

Remand Results at 3 (citation omitted).  As a result, the

Department revised the calculation of the surrogate financial

ratios to include expenses for jars and corks in the MLE

denominator.

In their response to the Remand Results, plaintiffs state

that they "agree with the Department['s]. . . determination that

in calculating surrogate value financial ratios, jars and corks

should be included as 'direct material costs' in the materials,

labor and energy denominator."  Pls.' Comments 2.  No other party

has objected to the Department's finding.  Accordingly, the court

sustains Commerce's inclusion of jar and cork expenses in its

calculation of surrogate financial ratios.

B.    Calculation of Labor Costs

The cost of labor is another factor of production used to determine normal value.  To calculate the labor wage rate in NME countries, Commerce, pursuant to its regulations, employs a regression-based analysis using data from multiple countries. *See Dorbest Ltd. v. United States*, 30 CIT __, __, 462 F. Supp. 2d 1262, 1291 (2006); *see* 19 C.F.R. § 351.408(c)(3) ("For labor, the Secretary will use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries.  The Secretary will calculate the wage rate to be applied in nonmarket economy proceedings each year.  The calculation will be based on current data, and will be made available to the public.").

In *Zhejiang I*, plaintiffs challenged the Department's use of this methodology, primarily because it was based on a basket of countries not economically comparable to China, which "contradicts the statute's language that the factors of production be valued using data from economically comparable countries pursuant to 19 U.S.C. § 1677b(c)(4)."  32 CIT at __, Slip Op. 08-68 at 34-35 (quotation omitted).  On remand the court instructed Commerce to reconsider its analysis

> with specific reference to the reliance on
> data from countries whose level of
> development is not comparable to the PRC, and
> how its insistence that it need not alter its
> database for the wage rate calculation
> conforms to its behavior in other cases.

*Zhejiang I*, 32 CIT at __, Slip Op. 08-68 at 44.

On remand the Department "recalculated the regression analysis to include all countries for which data are available and suitable, pursuant to the country data selection criteria established in *Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty Drawback; and Request for Comments*, 71 Fed. Reg. 61,716 (Dep't of Commerce October 19, 2006) ("Selection Criteria"). . . . ."  Remand Results at 6. Commerce thus revised its labor rate regression to include all countries in its analysis that meet the Department's Selection Criteria.  *Id*.  Plaintiffs state that they "do not challenge the Department's redetermination."  Pls.' Comments 2.  Nor does any other party object to Commerce's findings.  Consequently, the court sustains Commerce's redetermination regarding the selection of data[10] to calculate the labor wage rate.

C.   Calculation of Brokerage and Handling

In the Final Results, in calculating surrogate values, Commerce used a simple average of two surrogate values to

---

[10]     The only question dealing with Commerce's cost of labor regulations addressed by this opinion relates to which countries should be included in Commerce's regression analysis.  The court does not have before it issues dealing with the validity of the regression analysis, and therefore has made no finding with respect thereto.  *Cf. Allied Pac. Food (Dalian) Co. v. United States*, 32 CIT __, __ 587 F. Supp. 2d 1330, 1361 (2008) (concluding "that 19 C.F.R. § 351.408(c)(3) is contrary to 19 U.S.C. § 1677b(c) and therefore invalid.").

calculate domestic brokerage and handling.  *See* Remand Results at

18.  Commerce calculated this average using data provided by

Essar Steel Limited ("Essar Steel") and Pidilite Industry

("Pidilite").  Commerce explained that the simple average

"achieves the most representative surrogate value in lieu of a

honey-specific brokerage and handling value."  Remand Results at

18 (citation omitted).  Moreover, the Department explained in the

Final Results that "it calculated the surrogate value using the

Essar Steel and Pidilite data because together they constitute

the best available information for valuing brokerage and handling

based on the quality and specificity of the data."  Remand

Results at 18.

In *Zhejiang I*, plaintiffs challenged the Department's use of

the Pidilite data, arguing that only the Essar Steel data should

be used because: "(1) the Essar data is more contemporaneous; and

(2) the Pidilite data has an aberrationally high brokerage and

handling value based on a very low sales quantity."  *Zhejiang I,*

32 CIT at __, Slip Op. 08-68 at 40 (citation and quotation

omitted).

The *Zhejiang I* court found that "Commerce acted within its

discretion when it concluded that, in the absence of data more

specific to honey, the several months' difference in

contemporaneousness was not material, and thus that the Pidilite

data should not be excluded on that basis alone."  32 CIT at ___,

Slip Op. 08-68 at 42.  However, the court also found that:

> Commerce's determination that use of a simple
> average of the data constituted the best
> available information for valuing brokerage
> and handling, . . . does not appear to be
> supported by substantial evidence.  Commerce
> states that the Pidilite data constitutes the
> best available information for valuing
> brokerage and handling because of the data's
> "quality and specificity."  The Department at
> no point, however, explains how the data
> meets either one of these standards.

*Id.* at __, Slip Op. 08-68 at 42.

On remand, the Department "continues to find that the combination of both Pidilite and Essar Steel comprise the best available information in terms of quality and specificity." Remand Results at 19.

The Department explained that "lacking a honey-specific brokerage and handling value, the brokerage and handling costs of Essar Steel's hot-rolled carbon steel flat products, and Pidilite's carbazole violet pigment, are equally applicable to determine a surrogate brokerage and handling value."  Remand Results at 19 (citation omitted). "[W]ithout additional record evidence to suggest that hot-rolled steel was more comparable to honey than carbazole violet pigment, the selection of either Pidilite's or Essar's data over the other would not be supported by substantial evidence."  Def.'s Resp. 5 (citation omitted).

In objecting to the use of the Pidilite data on remand, plaintiffs make three primary arguments: (1) that Commerce has not shown that the Pidilite data is as representative as the

Essar Steel data; (2) that the Pidilite data should not be used because it consists of only 19 shipments, while the Essar Steel data represents 446 shipments;[11]  and (3) that the Pidilite data itself is marred by the presence of "clearly anomalous" value derived from a single shipment.  *See* Pls.' Mem. 3-6.  Despite plaintiffs' arguments to the contrary, the Department has supported with substantial evidence both the use of the Pidilite data and the use of a simple average.

First, Commerce has shown that the Pidilite data is as representative as the Essar Steel data.  As noted, there are no brokerage and handling values for honey on the record.  Thus, the Department looked elsewhere.  The Essar Steel data represents values for steel; those for Pidilite, brokerage and handling costs for carbazole violet pigment.  Each of these products is far removed from honey, however, no party questions the use of the Essar Steel data.

That being the case, it is difficult to see how the Pidilite data is less representative of honey than the Essar Steel data.  Both data sets are relatively contemporaneous to each other and to the POR.  *See Zhejiang I*, 32 CIT at __, Slip Op. 08-68 at 42.  While the Essar Steel data represents many price points, the nineteen price points for the Pidilite data is not a *de minimis*

---

[11]      *See* Factors of Production Valuation Mem. for the Preliminary Results and Partial Rescission of Antidumping Duty Admin. Review of Honey from the PRC dated December 9, 2005, Administrative Record 229, Att. 15.

number. Thus, the court agrees with Commerce that:

> in terms of specificity, the Department finds
> that neither of the products shipped by Essar
> Steel nor Pidilite is more or less comparable
> to honey, and thus the brokerage and handling
> costs of both are equally relevant. In terms
> of quality, the Department finds that neither
> Essar Steel nor Pidilite are more or less
> reliable than the other, and thus are both
> equally reliable.

Remand Results at 19.

Commerce's decision to use the Pidilite data even though it represents fewer data entries than the Essar Steel data is also not unreasonable. The mere fact that there are fewer data points does not necessarily render the Pidilite data unreliable, and plaintiffs have provided no specific reason pointing to the data's unreliability.

Finally, plaintiffs' insistence that the Pidilite data should either be adjusted or disregarded altogether because of the presence of one "clearly anomalous" data entry is unconvincing. Again, beyond pointing out that the price for one entry is far greater than the other 18 price points, plaintiffs give no reason why that price point should be excluded. The court thus agrees with Commerce that plaintiffs "fail[] to cite to any record evidence demonstrating that the price values for the 19 shipments 'skewed' the data and fails to identify any record evidence establishing the 'normal' brokerage and handling value for carbazole violet pigment" which would demonstrate that a "particular shipment value was aberrational." Def.'s Resp. 5.

Accordingly, the court finds that because there is no record evidence supporting a conclusion that Commerce should exclude a particular Pidilite shipment value, or exclude Pidilite's data as a whole, Commerce's inclusion of Pidilite's data to calculate the brokerage and handling value is reasonable. The court thus finds that the Department has provided substantial evidence to support its use of the Pidilite data.

Further, the court sustains Commerce's decision to use a simple average of the Pidilite and Essar Steel data. Commerce explained that it found these two sets of data to be equally probative for determining the surrogate brokerage and handling value, and plaintiff has not demonstrated that its preference of using Essar Steel data alone will yield a more reliable result than the average of the Essar Steel and Pidilite data. Without additional record evidence to suggest that hot-rolled steel was more comparable to honey than carbazole violet pigment, the selection of either Pidilite's or Essar Steel's data over the other would not be supported by substantial evidence. This Court has held that "[w]here there exist[ ] on the record 'alternative sources of data that would be equally or more reliable ... it is within Commerce's discretion to use either set of data.'" *Wuhan Bee Healthy Co. v. United States*, 29 CIT 587, 592-93, 374 F. Supp. 2d 1299, 1304 (2005) (quoting *Geum Poong Corp. v. United States*, 26 CIT 322, 326, 193 F. Supp. 2d 1363, 1369 (2002)).

Using the same reasoning Commerce acted within its discretion by

including both sets of data and averaging them.


### CONCLUSION

For the foregoing reasons, the court sustains the

Department's Remand Results.


                                        /s/Richard K. Eaton
                                        Richard K. Eaton


Dated:     June 19, 2009
           New York, New York