Slip Op. 09-71

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                               :
ARCH CHEMICALS, INC., and      :
HEBEI JIHENG CHEMICALS,        :
CO., LTD.,                     :
                               :
      Plaintiffs,              :
                               :
            v.                 :   Before: Richard K. Eaton, Judge
                               :
UNITED STATES,                 :   Consol. Court No. 08-00040
                               :
      Defendant,               :
                               :
          and                  :
                               :
CLEARON CORPORATION and        :
OCCIDENTAL CHEMICAL            :
CORPORATION,                   :
                               :
      Defendant-Intervenors.   :
_____:
                               :
CLEARON CORPORATION and        :
OCCIDENTAL CHEMICAL            :
CORPORATION,                   :
                               :
      Plaintiffs,              :
                               :
            v.                 :
                               :
UNITED STATES,                 :
                               :
      Defendant,               :
                               :
          and                  :
                               :
ARCH CHEMICALS, INC., and      :
HEBEI JIHENG CHEMICALS,        :
CO., LTD.,                     :
                               :
      Defendant-Intervenors.   :
_____:
```

OPINION AND ORDER

[The United States Department of Commerce's final results of administrative review are sustained in part and remanded.]


Dated:  July 13, 2009

*Blank Rome LLP* (*Peggy A. Clarke* and *Roberta Kienast Daghir*), for plaintiffs/defendant-intervenors Arch Chemicals, Inc. and Hebei Jiheng Chemical Company, Ltd.

*Gibson, Dunn, & Crutcher LLP* (*Daniel J. Plaine*, *J. Christopher Wood*, and *Andrea F. Farr*) for plaintiffs/defendant-intervenors Clearon Corporation and Occidental Chemical Corporation.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*David F. D'Alessandris*); Office of Chief Counsel for Import Administration, United States Department of Commerce (*Sapna Sharma*), of counsel, for defendant United States.


Eaton, Judge:  This consolidated action is before the court on the motions for judgment on the agency record pursuant to USCIT Rule 56.2: of plaintiffs/defendant-intervenors Arch Chemicals, Inc. ("Arch") and Hebei Jiheng Chemical Company, Ltd. ("Jiheng"); and of plaintiffs/defendant-intervenors Clearon Corporation ("Clearon") and Occidental Chemical Corporation ("OxyChem").  Both motions challenge certain aspects of the United States Department of Commerce's ("Commerce" or the "Department") final results of the first administrative review of the antidumping duty order on chlorinated isocyanurates from the People's Republic of China ("PRC").  *See* Chlorinated

Isocyanurates from the PRC, 73 Fed. Reg. 159 (Dep't of Commerce

Jan. 2, 2008) (notice of final results) (the "Final Results");

Chlorinated Isocyanurates from the PRC, 73 Fed. Reg. 9,091 (Dep't

of Commerce Feb. 19, 2008) (notice of amended final results) (the

"Amended Final Results").  The Final Results cover the period of

review ("POR") December 16, 2004, through May 31, 2006, and

incorporate by reference the Department's Issues and Decision

Memorandum.  *See* Issues and Decision Mem. for the 2004 - 2006

Admin. Review of Chlorinated Isocyanurates from the PRC (Dep't of

Commerce Dec. 14, 2007) (the "I&D Mem.").  Jurisdiction is had

pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C.

§ 1516a(b)(1)(B)(i).

For the reasons that follow, Arch and Jiheng's motion is

granted and Clearon and OxyChem's motion is denied.  Accordingly,

the Final Results are sustained in part and remanded.


BACKGROUND

In June 2005, Commerce published an antidumping duty order

on chlorinated isocyanurates[1] from the PRC.  *See* Chlorinated

Isocyanurates from the PRC, 70 Fed. Reg. 36,561 (Dep't of

---

[1]    "Chlorinated isocyanurates are derivatives of cyanuric
acid, described as chlorinated s-triazine triones. . . . [They
are] available in powder, granular, and tableted forms."  *See*
Chlorinated Isocyanurates from the PRC, 72 Fed. Reg. 39,053,
39,054 (Dep't of Commerce July 17, 2007) (notice of preliminary
results) (explaining the scope of Commerce's antidumping duty
order).

Commerce June 24, 2005) (notice of antidumping duty order) (the "Order"). The following year, in June 2006, the Department published a notice of opportunity to request an administrative review of the Order. *See* Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Admin. Review, 71 Fed. Reg. 32,032 (Dep't of Commerce June 2, 2006) (notice). Among others, Clearon and OxyChem, petitioners in the original investigation, asked Commerce to conduct an administrative review of foreign producer/exporter Jiheng's sales and entries of chlorinated isocyanurates during the POR. *See* Chlorinated Isocyanurates from the PRC, 72 Fed. Reg. 39,053, 39,053 (Dep't of Commerce July 17, 2007) (notice of preliminary results) (the "Preliminary Results"). Jiheng also asked the Department to review its sales of subject merchandise. *Id.* Consequently, in July 2006, the Department initiated an administrative review with respect to Jiheng. *See* Initiation of Antidumping and Countervailing Duty Admin. Reviews and Request for Revocation in Part, 71 Fed. Reg. 42,626 (Dep't of Commerce July 17, 2006) (notice).

Commerce published the Preliminary Results of its review in July 2007, and its Final Results in January 2008, as amended in February 2008. *See* Preliminary Results, 72 Fed. Reg. at 39,053; Final Results, 73 Fed. Reg. at 159; Amended Final Results, 73 Fed. Reg. at 9,091.

STANDARD OF REVIEW

The court must uphold a final determination by the Department in an antidumping proceeding unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Thus, "Commerce's findings must be reached by reasoned decision-making, including . . . a reasoned explanation supported by a stated connection between the facts found and the choice made."  *Rhodia, Inc. v. United States*, 28 CIT 1278, 1283, 185 F. Supp. 2d 1343, 1349 (2001) (citations and quotations omitted).

DISCUSSION

I.  Arch and Jiheng's Motion

Arch and Jiheng argue that Commerce committed three errors that led to its improper decision to reject Jiheng's by-product offset claims.  First, they claim that Commerce erred by concluding that Jiheng's factors of production ("FOPs") were reported net of its by-product consumption.  Next, they insist that the Department improperly calculated normal value using a new practice without providing notice to Jiheng.  Last, they argue that Commerce erred by finding that there was insufficient information on the record to identify the portions of purchased sulfuric acid and recovered sulfuric acid used to produce ammonium sulfate.

A.  Legal Framework for By-Product Offset Claims

The antidumping statute "does not mention the treatment of by-products," and Commerce has not filled the statutory gap with a regulation.  *See Guangdong Chems. Imp. & Exp. Corp. v. United States*, 30 CIT 1412, 1422, 460 F. Supp. 2d 1365, 1373 (2006). Generally, however, the Department's practice has been to grant an offset to normal value,[2] for sales of by-products generated during the production of subject merchandise, if the respondent can demonstrate that the by-product is either resold or has commercial value and re-enters the respondent's production process.  *See Ass'n of Am. School Paper Suppliers v. United States*, 32 CIT __, __, Slip Op. 08-122 at 17 (Nov. 17, 2008) (not reported in the Federal Supplement).  Thus, the burden rests with the respondent to substantiate by-product offsets by providing the Department with sufficient information to support its claims. *See id.* at __, Slip Op. 08-122 at 18-23.

---

[2]     Normal value or home market value is defined as

   the price at which the foreign like product
   is first sold (or, in the absence of a sale,
   offered for sale) for consumption in the
   exporting country, in the usual commercial
   quantities and in the ordinary course of
   trade and, to the extent practicable, at the
   same level of trade as the export price or
   constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i).

B.  Arch and Jiheng's By-Product Reporting

Arch and Jiheng's first complaint is that the Department erred in concluding that "the costs reported [by Jiheng] were net of the costs of the by-product production."  *See* Mot. J. Agency R. of Arch and Jiheng ("Arch/Jiheng Br.") 11.  They insist that this conclusion was wrong and that Jiheng reported its FOPs to include the "costs" in producing the by-products for which Jiheng claimed offsets.  *See* Arch/Jiheng Br. 11.  In other words, they argue that Commerce erred by failing to recognize that Jiheng did not deduct amounts used to produce by-products from its FOP reporting.

With respect to this argument, defendant concedes the Department's error.  It states: "Jiheng correctly notes that Commerce made an error when it reviewed Jiheng's calculations and determined that Jiheng had reported its costs net of the costs of the by-product production."  Def.'s Opp'n to Pls.' and Def.-Ints.' Mots. J. Agency R. ("Def.'s Br.") 29-30.

It is apparent that Commerce erred in its conclusions with respect to the reporting of these costs.  On remand, in addition to those instructions set out below, the Department is directed to calculate Jiheng's claimed by-product offsets consistent with its recognition that Jiheng did not report its costs net of the costs of by-product production.

C.    Alleged Change in Commerce's Practice

In the original investigation and in the Department's Preliminary Results for this first administrative review, Commerce accepted the sales documentation provided by Jiheng as sufficient to substantiate its claimed by-product offsets.  In the Final Results, however, Commerce determined that Jiheng's questionnaire responses were insufficient and rejected Jiheng's claims.

By their motion, Arch and Jiheng argue that the Department acted unlawfully by providing neither notice nor explanation when it allegedly changed the practice by which it grants by-product offsets.  They maintain that "principles of fairness" prevent the Department's action because Jiheng was given no notice and no "opportunity to provide the precise information required," and instead first learned of Commerce's change in practice in the Final Results.  *See* Arch/Jiheng Br. 14 (quoting *Shikoku Chems. Corp. v. United States*, 16 CIT 382, 388, 795 F. Supp. 417, 421 (1992)).  They further assert that Commerce's claimed questionnaire change was insufficient to alert the company that it must provide additional data to support its by-product production.  *See* Arch/Jiheng Br. 14-16.  Arch and Jiheng acknowledge that Commerce may change course if it explains its reason for doing so, but assert that here the Department acted unfairly, unlawfully, and without a proper explanation.  *See*

Arch/Jiheng Br. 14.

As noted, Arch and Jiheng insist that the Department's
argument that a new question put Jiheng on notice of a change in
practice is without merit.  For them, Commerce's various
questionnaires gave no notice that the Department had changed its
practice.  Rather, they claim that the company reasonably
believed that Commerce was only seeking more detailed information
than it had previously and there was no indication that Jiheng
needed to provide production data for claimed by-products.  *See*
Arch/Jiheng Br. 21.  Moreover, they maintain that, "[d]espite the
Department's alleged change in practice, the Department accepted
the data provided as adequate for the purpose of the Preliminary
Results without any discussion of a change in practice."
Arch/Jiheng Br. 20-21.

Furthermore, Arch and Jiheng argue that Commerce failed to
provide an adequate explanation for its change in practice.  They
insist that it was insufficient for the Department to simply cite
one past investigation, *Certain Lined Paper Products From the
PRC*, 71 Fed. Reg. 53,079 (Dep't of Commerce Sept. 8, 2006)
("*Certain Lined Paper*"),[3] that purportedly had previously

---

[3]   In *Certain Lined Paper*, Commerce found that "there was
not enough documentary evidence at verification to successfully
demonstrate that the[] two companies actually received the income
from their waste paper sales."  *See* Issues and Decision Mem. for
the Less-Than-Fair-Value Investigation of Certain Lined Paper
(continued...)

"clarified" its practice.  *See* Arch/Jiheng Br. 20.

For its part, Commerce contends that it lawfully denied Jiheng's claimed offsets because the company did not submit documents demonstrating the amount of by-products produced during the POR, despite the clear directions in the questionnaires to do so.  The Department argues that its questionnaires contained a new variable that specifically sought such information.  It maintains that Jiheng failed to submit production data and instead "provided evidence demonstrating <u>sales</u> of downstream products that were produced using by-products, and stated that it derived the amount of by-products produced during the [POR] using sales invoices."  Def.'s Br. 28 (citations omitted).  Thus, according to Commerce, although the Department granted the offsets in the original investigation and the Preliminary Results, it determined, "after reviewing parties' briefs," that it was unable to grant the by-product offsets in the Final Results because it could not determine the amount of by-product produced by Jiheng during the POR.  *See* Def.'s Br. 29.

In addition, the Department states that it recognized that it was changing its position from the Preliminary Results and provided the necessary reasoned explanation.  It maintains: "Commerce is generally at liberty to discard one methodology in

---

[3](...continued)
Prods. from the PRC at Comment 11 (Dep't of Commerce Sept. 8, 2006).

favor of another where necessary to calculate a more accurate dumping margin; however, Commerce must explain the basis for its change of methodology and demonstrate that its explanation is in accordance with law and supported by substantial evidence." Def.'s Br. 30 (citation omitted).  According to the Department, the Final Results explained that Commerce was changing course in order to act in a manner consistent with its policy of requiring respondents to demonstrate not only that by-products were sold or reintroduced into the production process during the POR, but actually produced during that period.  *See* Def.'s Br. 30-31.

### 1.  Jiheng's Previous By-Product Reporting

Given the nature of the parties' dispute, a detailed review of the history of Jiheng's by-product reporting is warranted.  In its original investigation, the Department issued a questionnaire to Jiheng that read in pertinent part:

> Please report the amount of byproducts or co-products produced per unit of subject merchandise.  Please report each co- or by-product in separate columns.  Identify only those co- or by-products that do not reenter the production process.

Arch/Jiheng Br. 17 (quoting Section D: Factors of Prod. Questionnaire, Pub. R. Doc. No. ("PR") 157 at D-6).  Jiheng responded to the questionnaire and Commerce's preliminary determination granted the company its claimed offsets.  The Department explained:

> Both respondents reported certain by-products
> in producing the subject merchandise which
> each either re-sold or re-used to produce the
> subject merchandise during the [period of
> investigation].  Therefore, in those
> instances where the respondent provided
> documentation to support its by-product
> claim, we allowed a recovery/by-product
> credit.  Our treatment of by-products in this
> proceeding is in accordance with the
> Department's practice.

Chlorinated Isocyanurates From the PRC, 69 Fed. Reg. 75,294,
75,301 (Dep't of Commerce Dec. 16, 2004) (notice of preliminary
determination) (citing Certain Hot-Rolled Carbon Steel Flat
Products From the PRC, 66 Fed. Reg. 49,632 (Dep't of Commerce
Sept. 28, 2001) (notice), and accompanying Issues and Decision
Mem. at Comment 3)).  Thus, in its preliminary determination
during the investigatory phase, Commerce acknowledged that it was
basing its allowance of the by-product offset on sales——not
production——data.  That is, even though the questionnaire asked
for production information, Commerce accepted sales information.
In doing so, Commerce stated that it was acting "in accordance
with the Department's practice."  Chlorinated Isocyanurates From
the PRC, 69 Fed. Reg. at 75,301.

Following verification, Commerce continued to grant Jiheng
its claimed by-product offsets to normal value in its final
results.  See Chlorinated Isocyanurates From the PRC, 70 Fed.
Reg. 24,502 (Dep't of Commerce May 10, 2005) (notice of final
determination), adopting Issues and Decision Mem. for the Final

Determination in the Antidumping Duty Investigation of

Chlorinated Isocyanurates from the PRC - Oct. 1, 2003, through

Mar. 31, 2004, at Comment 6 (Dep't of Commerce May 10, 2005) (the

"Investigation I&D Mem.").  The Department concluded that

> . . . Jiheng and Nanning have provided
> necessary information for their claim of
> by-products, including production re-use
> and/or sale information.  We have fully
> examined these companies' information at
> verification and confirmed, with one
> exception (i.e., Nanning's chlorine gas . .
> .), that the by-products at issue were
> compensated or were re-used in production.
> Therefore, we continue to grant, where
> applicable, by-product offsets to Jiheng and
> Nanning in the final determination.

Investigation I&D Mem. at Comment 6 (footnote omitted).  In other

words, Commerce found that Jiheng's questionnaire responses,

which provided calculations of the amount of by-products claimed

and documented sales of by-products and/or downstream products,

sufficient to justify an offset in accordance with its practice.

During the now disputed first administrative review, the

Department issued an initial questionnaire which had the

following question:

> Please report the amount of by-products or
> co-products produced per unit of merchandise
> under consideration.  Explain why you have
> defined the products as by-products or co-
> products, as applicable.  Describe the
> disposition of the by-products or co-products
> (e.g., sold, returned to production of the
> merchandise under consideration, discarded).
> If sold or returned to production, provide
> evidence thereof.  State whether you are
> claiming an offset to production costs for

> the by-product or co-product, and show how
> you calculated the amount claimed.  If you
> are claiming an offset, explain any further
> processing of the by-product or co-product,
> and list the factors and quantities thereof
> used in the further processing.

Arch/Jiheng Br. 17-18 (quoting Request for Info., PR 12 at D-9).

This question, expanding upon the question in the analogous

question asked by Commerce in the original investigation, appears

to be the new "variable" alleged by Commerce.  Yet, as in the

original investigation, the Department asked for production

information, but gave no indication that it was seeking

information materially different from that found sufficient in

the original investigation.

In response to this question, Jiheng "identified the by-

products unavoidably created as a result of the production of the

intermediary products that are used in the production of subject

merchandise," and "provided both the calculations of the amount

claimed and documentation of sales of the by-product or

downstream product, as applicable."  Arch/Jiheng Br. 6

(quotations and citations omitted).  Jiheng insists that this

method of responding was identical to that accepted by the

Department in the original investigation.  Arch/Jiheng Br. 6-7.

Commerce followed up on Jiheng's by-product reporting in its

Second Supplemental Questionnaire:

> You stated . . . that you are claiming
> offsets for four by-products that are created
> during the production of the intermediate

> products used to produce subject merchandise.
> Does your reported raw material consumption
> already account for the claimed by-product
> offset?  With respect to sodium hypochlorite,
> hydrogen gas and ammonium sulfate, which you
> state were sold, were any sales made to
> unaffiliated customers?  Provide
> documentation to support your claimed
> quantities of recovered by-products.

Second Suppl. Questionnaire dated Mar. 6, 2007, PR 63 at 15. Notably, this question requests information relating to re-use and sales——not production.

In its April 2007 response, Jiheng stated that "[t]he raw materials reported in the FOPs chart have all reflected all raw materials entering into the production, and also account for the claimed by-product offset generated during the production." Arch/Jiheng Br. 7 (quoting Jiheng Chemical, Resp. to Second Suppl. Questionnaire dated Apr. 5, 2007, Confidential R. Doc. No. ("CR") 14, at SS-37).  Arch and Jiheng note that Jiheng provided the Department with "monthly total sales, identified all invoices within a sample month, and provided sample invoices for that month."  Arch/Jiheng Br. 7 (citation omitted).  Further, "[t]o document the claimed quantities of recovered by-products, Jiheng Chemical supplied the formulae used (the same formulae verified and accepted in the [original] investigation) and documented the sales quantities to which these formulae were applied, the same methodology used in the investigation."  Arch/Jiheng Br. 7 (internal citation omitted).

Subsequently, in its Fourth Supplemental Questionnaire, the Department once again inquired about Jiheng's by-product reporting.  It asked Jiheng to provide information about its different production lines, about whether non-subject merchandise production generates the same by-products as that of subject merchandise, to submit worksheets about one of its plant's by-product production, and to provide source documentation supporting its recovered sulfuric acid claim.  *See* Fourth Suppl. Questionnaire dated May 17, 2007, PR 82, at 5-6.  Further, Commerce specifically asked: "*Please explain the way Jiheng Chemical keeps by-products records in the normal course of production.*"  *See* Fourth Suppl. Questionnaire dated May 17, 2007, PR 82, at 5 (emphasis added).

In response to the inquiry about its by-product record keeping, Jiheng wrote:

> Jiheng Chemical used the sales invoices to determine the recovered volume of the by-products, which is kept in the accounting department.  As explained . . . [in a prior] submission, Jiheng Chemical claimed the offset of the volume of by-products (1) directly sold to market, such as hydrogen gas; and (2) entering into the production of the merchandise, which was sold to the market, such as hydrochloric acid, sodium hypochlorite and ammonium sulfate. Therefore, Jiheng used the sales invoices . . . [and] samples of such sales have been provided in Jiheng Chemical's [prior] submission.

Jiheng Chemical, Resp. to Fourth Suppl. Questionnaire, June 8,

2007, CR 24, at FSR-24.  Again, according to Arch and Jiheng, this reporting methodology was identical to what was accepted by Commerce in the original investigation.  *See* Arch/Jiheng Br. 8.

The Department's Preliminary Results accepted Jiheng's reported by-product offsets.  *See* Arch/Jiheng Br. 8 (citing Preliminary Results, 72 Fed. Reg. at 39,053 ("We used the FOPs reported by respondents for materials, energy, labor, by-products, and packing.")).  Notably, the Preliminary Results were published on July 17, 2007, nearly a year after the publication of *Certain Lined Paper*, which Commerce claims "clarified that, without . . . documentation [of by-product production], Commerce has no way of knowing whether the quantity of by-product claimed was actually produced during the period of review, or the amount of income or savings that were actually realized by respondent through the sale or reintroduction of the by-product."  Def.'s Br. 31 (citation omitted).

In the Final Results, however, Commerce changed course and rejected Jiheng's claimed offsets.  Commerce's Issues and Decision Memorandum explains:

> We acknowledge that the Department granted
> Jiheng Chemical's claimed by-product offsets
> in the original investigation.  However,
> since then, the Department has changed its
> standard questionnaire to include a separate
> variable for claimed by-product offsets, and
> has also clarified its practice in granting
> such offsets.  In Lined Paper Products . . .
> the Department clearly articulated its
> position: "The mere fact that a company

demonstrates that it sold scrap has been
rejected by the Department in the past as a
justification for allowing a scrap offset."
The Department added that in order to be able
to grant an offset, "it is the Department's
practice to require that respondents provide
sufficient documentation of the actual
{by-product} produced and the amount of the
{by-product} reintroduced into the production
process."

. . . [We are] unable to allow the offset in
this segment of the proceeding, however,
because Jiheng Chemical failed to provide
documentation of the actual amount of the
by-products generated from the production of
subject merchandise.

I&D Mem. at Comment 15 (footnotes and citations omitted).

   2.   The Department's By-Product Offset Determinations is
        Remanded

The Final Results, when viewed in the context of Jiheng and

Commerce's interactions during the course of the proceedings

leading up to the Final Determination, demonstrate that the

methodology used by Commerce amounts to an unannounced and

inadequately explained change in practice.  As such, the issue of

Jiheng's by-product offsets must be remanded for reconsideration.

    Commerce generally has discretion to discard one

methodology in favor of another in order to calculate more

accurate dumping margins.  *See Fujian Mach. and Equip. Imp. &*

*Exp. Corp. v. United States*, 25 CIT 1150, 1169, 178 F. Supp. 2d

1305, 1327 (2001).  This discretion, however, is subject to two

limitations.  First, "Commerce may not make minor but disruptive

changes in methodology where a respondent demonstrates its specific reliance on the old methodology used in multiple preceding reviews"; second, "in every instance where an agency changes tack, it must provide a reasoned explanation for doing so." *Id.* at 1169-70, 178 F. Supp. 2d at 1327 (citation omitted); *see also Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007) ("When an agency decides to change course . . . it must adequately explain the reason for a reversal of policy.") (citation omitted).

In support of their arguments, Arch and Jiheng cite *Shikoku Chemicals Corp. v. United States*, 16 CIT 382, 795 F. Supp. 417 (1992) ("*Shikoku*"), where this Court held that reliance on prior administrative practice can, in certain circumstances, be sufficient to prevent Commerce from changing course without providing notice. In *Shikoku*, plaintiffs challenged Commerce's final results of the fifth and sixth administrative reviews of an antidumping duty order. In those final results, Commerce employed a different methodology than it used in the original investigation and the first four administrative reviews. *Id.* at 384, 795 F. Supp. at 418. Plaintiffs argued that they were being unfairly penalized by Commerce's decision to use a new methodology because they relied on the Department's old practice.

Commerce insisted that plaintiffs "had no right to rely on the continuation of a particular calculation methodology." *See*

*id.* at 384, 795 F. Supp. at 420.  Moreover, the Department

maintained that, even if the court found Commerce to have changed

its methodology, its final determination should still be upheld

because it was explained adequately and supported by substantial

evidence.  *Id.* at 384, 795 F. Supp. at 419.

The *Shikoku* Court concluded that Commerce acted unreasonably

and did not provide a sufficient explanation for changing

methodologies:

> Principles of fairness prevent Commerce from
> changing its methodology at this late stage.
> Commerce is required to administer the
> antidumping laws fairly.  Adherence to prior
> methodologies is required in some
> circumstances. . . .

*Id.* at 388, 795 F. Supp. at 421 (footnote and citation omitted).

*Shikoku* involved a longer period of reliance than in this

case, but the logic underpinning its holding remains useful here.

Thus, for the court, as in *Shikoku*, "principles of fairness"

prevent the Department from modifying its by-product offset

analysis without giving Jiheng notice of the change.  *See NEC*

*Corp. v. United States*, 151 F.3d 1361, 1371 (Fed. Cir. 1998)

("[T]here inheres in a statutory scheme such as this an

expectation that those charged with its administration will act

fairly and honestly."); *Budd Co., Wheel & Brake Div. v. United*

*States*, 14 CIT 595, 602, 746 F. Supp. 1093, 1099 (1990) (stating

that the Federal Circuit has made clear that "fairness is the

touchstone of Commerce's duty in enforcing the antidumping laws"). This is particularly the case given that the Department's questionnaires in this first administrative review did not seek materially different information from that sought in the original investigation.

Moreover, no serious argument can be made that *Certain Lined Paper* provided either notice of or an explanation of Commerce's changed practice. First, an examination of the final results and accompanying Issues and Decision Memorandum in that investigation reveals that at no point does the Department state that henceforth only production information would be sufficient to justify a by-product offset. Second, any claim that *Certain Lined Paper*'s results informed Jiheng of a change in practice is discounted by the fact that Commerce's own personnel did not take *Certain Lined Paper* into account in preparing the Preliminary Results.

Accordingly, the court finds that Commerce did not act reasonably under the circumstances and remands this matter to the Department for reconsideration. On remand, the Department shall reopen the record and provide Jiheng with sufficient opportunity to submit documentation relevant to the methodology Commerce employs in its by-product analysis. Commerce shall notify Jiheng precisely what information it expects Jiheng to produce. Commerce shall then complete its by-product offset analysis

accordingly.

II.  Clearon and OxyChem's Motion

Domestic companies Clearon and OxyChem challenge the
Department's calculation of surrogate values for urea, sea salt,
and steam coal, each of which is used in Jiheng's production of
the subject merchandise.  For the reasons set forth below, the
Department's surrogate value calculations are sustained.

A.  Legal Framework for Calculating Surrogate Values

In determining whether the subject merchandise is being, or
is likely to be, sold at less than fair value, 19 U.S.C.
§ 1677b(a) requires Commerce to make "a fair comparison . . .
between the export price[4] or constructed export price[5] and normal
value."  When merchandise that is the subject of an antidumping
investigation is exported from a nonmarket economy country,[6] such

---

[4]     The "export price" is "the price at which the subject
merchandise is first sold . . . by the producer or exporter of
the subject merchandise outside of the United States to an
unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States," as adjusted.  19
U.S.C. § 1677a(a).

[5]     "Constructed export price" is "the price at which the
subject merchandise is first sold . . . in the United
States . . . by or for the account of the producer or exporter of
such merchandise or by a seller affiliated with the producer or
exporter, to a purchaser not affiliated with the producer or
exporter," as adjusted.  19 U.S.C. § 1677a(b).

[6]     A "nonmarket economy country" is "any foreign country
                                                      (continued...)

as the PRC, Commerce, under most circumstances, determines normal

value by valuing the FOPs used in producing the merchandise using

surrogate data.[7]  The statute directs Commerce to value the FOPs

"based on the best available information regarding the values of

such factors in a market economy country or countries considered

to be appropriate by the [Department] . . . ."  19 U.S.C.

§ 1677b(c)(1).  "Specifically, Commerce's task in a nonmarket

economy investigation is to calculate what a producer's costs or

prices would be if such prices or costs were determined by market

forces."  *Tianjin Mach. Imp. & Ex. Corp. v. United States*, 16 CIT

---

[6](...continued)
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480,
481, 318 F. Supp. 2d 1339, 1341 (2004).  Therefore, because the
subject merchandise comes from the PRC, Commerce constructed
normal value by valuing the FOPs using surrogate data from India.
*See* 19 U.S.C. § 1677b(c)(4).

[7]      Section 1677b(c)(4)(A) requires that:

    The administering authority, in valuing
    factors of production [to determine normal
    value of the subject merchandise exported
    from a nonmarket economy], shall utilize, to
    the extent possible, the prices or costs of
    factors of production in one or more market
    economy countries that are . . . at a level
    of economic development comparable to that of
    the nonmarket economy country . . . .

931, 940, 806 F. Supp. 1008, 1018 (1992).

B.  Surrogate Value for Urea

Clearon and OxyChem argue that the Department did not use the "best available information" in selecting the source of a surrogate value for urea.  19 U.S.C. § 1677b(c)(1).  As a surrogate value, the Department used the weighted-average unit value of Indian imports from the World Trade Atlas ("WTA"), which included data from the Oman India Fertilizer Company ("OMIFCO"). Clearon and OxyChem assert that "Commerce erred by including in its calculations the value of imports of urea to India from Oman . . . . [when the] record revealed these data to consist solely of imports by the Government of India from a joint venture controlled by the governments of India and Oman [OMIFCO]."  Mot. J. Agency R. Clearon and OxyChem ("Clearon/OxyChem Br.") 2.

According to Clearon and OxyChem, the OMIFCO prices were anomalous because the joint venture did not sell urea on the open market, but rather "has committed to sell all of its urea output for 15 years to the Government of India under a declining, price-fixed contract irrespective of changes in the market price for urea."  Clearon/OxyChem Br. 15.  Thus, they maintain that Commerce's acts were "inconsistent with a broad array of judicial and administrative precedent directing Commerce to avoid the use of prices that have been distorted by government involvement."

Clearon/OxyChem Br. 15.  For Clearon and OxyChem, the Department erroneously based the decision to use these prices on whether the OMIFCO data was "aberrational."  They assert that the data should have simply been rejected outright, because the prices were not determined by the market.

Clearon and OxyChem additionally claim that Commerce's decision to employ an "aberrational" price analysis for the OMIFCO imports was "compounded by factually inaccurate statements in support of its conclusion."  Clearon/OxyChem Br. 23.  They argue: "Commerce's stated basis for refusing to exclude the Oman import values — that the Oman imports were at comparable or higher prices than other imports of urea to India — was factually incorrect."[8]  Clearon/OxyChem Br. 3.  Accordingly, they ask that

---

[8]     WTA data for imports of urea from December 2004 through May 2006 was as follows:

| Country | Quantity (KG) | Average Value (Rupees/KG) |
|---|---|---|
| United Kingdom | 3,000 | 6.67 |
| Oman | 1,291,398,509 | 6.99 |
| Bahrain | 21,997,000 | 11.53 |
| Saudi Arabia | 135,027,000 | 11.60 |
| United Arab Emirates | 139,815,134 | 11.65 |
| Ukraine | 245,524,000 | 11.85 |
| Qatar | 142,167,000 | 11.87 |
| Bangladesh | 20,999,000 | 12.27 |
| Kuwait | 16,497,000 | 12.32 |

(continued...)

the court to remand the determination to the Department for further consideration.

Commerce argues that, by comparing the weighted-average unit value for all Indian imports of urea to that of OMIFCO, and determining that the OMIFCO data was not aberrational, it complied with section 1677(b)(c)(1)'s "best available information" standard. It states that it "compared the weighted-average unit value for urea imports from Oman with the values of imports from other market-economy countries, and found that, contrary to Clearon's allegations, the value for imports from Oman was within the range of imports of urea from other market-economy countries." Def.'s Br. 11 (citing I&D Mem. at Comment 1). Having found that the value of the Omani imports was not aberrational, Commerce argues that it was correct not to exclude this data. Def.'s Br. 12 (citing *Allied Tube & Conduit Corp. v. United States*, 32 CIT __, __, 556 F. Supp. 2d 1350, 1353 (2008)).

With respect to Clearon and OxyChem's argument that Commerce was factually incorrect in finding that Omani imports were "comparable" to other imports of urea into India, Commerce notes

---

[8](...continued)

| Russia | 66,702,000 | 12.58 |
|---|---|---|
| Germany | 760 | 30.26 |
| **Total** | 2,080,130,403 | 8.83 |

Clearon/OxyChem Br. 6 (footnote and citation omitted).

that, "[a]lthough the Omani value was the second lowest" of all imports, "this fact alone does not indicate an aberrational price, because the quantity of Omani imports was far larger than all other Indian imports of urea." Def.'s Br. 12 (citation omitted). Apparently, Commerce is arguing that the Omani price was at the low end of the range because it would be subject to a volume discount. The Department also insists that it is appropriate to include these imports notwithstanding Clearon and OxyChem's argument concerning government control because "Oman is a market economy country and, therefore, its imports would not be excluded based upon Commerce's non-market practices," particularly given that Commerce determined that the prices were not aberrational. *See* Def.'s Br. 14-15. Therefore, the Department asks the court to sustain its calculation of the surrogate value for urea.

The court finds that Commerce acted reasonably by declining to exclude the OMIFCO data when selecting the surrogate value for urea. Although not a hard-and-fast rule,[9] when selecting

---

[9] For example, Commerce may use non-public information when doing so is consistent with its duty of calculating a more accurate dumping margin.

> As the United States Court of Appeals for the
> Federal Circuit has explained . . ., actual
> prices paid for inputs on the international
> market are more accurate and indicative of
> actual input cost than surrogate values and
> therefore are preferable as they yield a more

(continued...)

surrogate data, Commerce has a longstanding preference to "use public, country-wide data, where it is available," and will also consider the "quality, specificity and contemporaneity of the data." *See Mittal Steel Galati S.A. v. United States*, 31 CIT __, __, 502 F. Supp. 2d 1295, 1298 (2007) (citations omitted). This preference has been sustained by numerous decisions of this Court. *See Sichuan Changhong Elec. Co. v. United States*, 30 CIT 1481, 1492, 460 F. Supp. 2d 1338, 1349 (2006) ("The Court has consistently sustained Commerce's preference for publicly-available information representative of the industry norm."); *Wuhan Bee Healthy Co. v. United States*, 31 CIT __, __, Slip Op. 07-113 at 25 (July 20, 2007) (not reported in the Federal Supplement).

Here, the WTA data is from a publicly available source for the POR. Additionally, Commerce analyzed that data to ensure that "value for imports from Oman to India was not aberrational, and was comparable to imports from other market economy countries." Def.'s Br. 11 (citation omitted). As has been seen,

---

[9](...continued)
            accurate dumping margin.  Actual input prices
            paid, however, are not necessarily public
            information.

*See Allied Pac. Food (Dalian) Co. v. United States*, 30 CIT 736, 761-62, 435 F. Supp. 2d 1295, 1317-18 (2006) (citing *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994)).

the Omani value was within the range of values examined, though
at the low end, and was close to the average value, i.e., 6.99
rupees/KG for Oman and 8.83 rupees/KG for the average of all data
sets.  Furthermore, as Arch and Jiheng point out, the Department
has previously engaged in analyses to determine if surrogate
value data is aberrational and thus there is nothing novel about
its methodology.  *See* Arch/Jiheng Opp'n Br. 11 (citing Certain
Hot-Rolled Carbon Steel Flat Prods. from Rom., 70 Fed. Reg.
34,448 (Dep't of Commerce June 14, 2005) (notice of final
results), adopting Issues and Decision Mem. for the 2002-03
Antidumping Duty Admin. Review: Certain Hot-Rolled Carbon Steel
Flat Prods. from Rom., at Comment 2 (Dep't of Commerce June 6,
2005) (analyzing allegations of aberrational surrogate value
data)).  In addition, Commerce acted reasonably in concluding
that "economies of scale is one factor contributing to OMIFCO's
price [being lower than that of other urea imports into India],
given the quantity of imports from Oman into India."  *See* I&D
Mem. at Comment 1; Def.'s Br. 12 (noting that "the quantity of
Omani imports of urea was higher than the quantity of all other
Indian imports of urea combined").  Thus, having found that the
OMIFCO data was "within the normal range" and taking into
consideration the large quantity of OMIFCO imports, it cannot be
said that Commerce was unreasonable in using this information.

Moreover, the court is unconvinced that Commerce erred by

not excluding the OMIFCO data as tainted by reason of government involvement.  Oman and India are market economy countries and there is no evidence that, at the time the contract was entered into, the prices set were not market-driven.  In addition, Commerce could reasonably find that, the mere fact that a product is sold to a single purchaser pursuant to a long-term contract, does not necessarily make the price anomalous.  Further, there was no record evidence demonstrating that urea sales made subject to the contract were distorted.

Therefore, the court sustains Commerce's surrogate value calculation for urea.  "Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was reasonable."  *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT 1185, 1190, Slip Op. 04-88 at 9-10 (2004) (not reported in the Federal Supplement) (quotation omitted).


C.  Surrogate Value for Sea Salt

Salt is a key component in Jiheng's production process, during which sea salt is used to create chlorine gas and caustic soda——two of the "principal inputs" in the production of subject merchandise.  *See* Clearon/OxyChem Br. 11.  Clearon and OxyChem take issue with the Department's selection of the WTA import data for rock salt as a surrogate value for the sea salt actually used

by Jiheng.  Rather than the rock salt value, they maintain that
Commerce should have used vacuum salt pricing data, as published
in the Indian publication *Chemical Weekly*.  Clearon/OxyChem Br.
29.

Clearon and OxyChem assert that Commerce's decision to
reject the *Chemical Weekly* pricing data and rely on the
International Trade Commission's ("ITC") determination in *Rock
Salt From Canada* was erroneous.  *See* Rock Salt From Can., USITC
Pub. 1658, n.6, No.731-TA-239 (Mar. 1985).  In support of their
position, they argue that Commerce improperly "disregard[ed] the
evidence that rock salt is produced through a completely
different process [involving mining] than the evaporative methods
[involving evaporating salt-containing brine] used to produce sea
salt and vacuum salt."  Clearon/OxyChem Br. 28.  In addition,
they insist that Commerce failed to fully consider the vacuum
salt pricing data contained in *Chemical Weekly*.  *See*
Clearon/OxyChem Br. 31.  It is worth noting at the outset,
however, that they never make clear why this distinction is
important.  If not vacuum salt, Clearon and OxyChem alternatively
claim that Commerce should have used WTA import data under the
Harmonized Tariff Schedule ("HTS")[10] subheading "other salts of
pure sodium chloride" because it was "the only import category

---

[10]    The Harmonized Tariff Schedule ("HTS") referred to
herein is that of the Republic of India.

that actually covered the input in question - sea salt." *See* Clearon/OxyChem Br. 29.

Commerce argues that it properly selected rock salt as a surrogate because it is the "most similar" to the sea salt used by Jiheng in its production process. Def.'s Br. 16. Specifically, "Commerce found that [imports under the] the HTS [subheading] for 'rock salt' was the most appropriate surrogate for Jiheng's input, because [rock salt] is most similar in purity and crystal size" to sea salt. Def.'s Br. 16-17 (citing I&D Mem. at Comment 2).

Commerce acknowledges that certain types of salts may have overlapping applications (for example, can be used for both food and industrial purposes), but notes that it arrived at its determination to use rock salt based on specific evidence provided by Jiheng demonstrating that it used "industrial grade sea salt, which is manufactured by allowing sea water to evaporate, and which does <u>not</u> undergo further processing to be sold as 'high purity' vacuum salt." Def.'s Br. 19 (citing I&D Mem. at Comment 2). In other words, Commerce argues that although rock salt and vacuum salt can both be used in the production of chemicals, it determined that rock salt was the most similar to the salt actually used by Jiheng because vacuum salt is more processed and refined.

Furthermore, as to Clearon and OxyChem's contention that

Commerce did not fully consider the domestic *Chemical Weekly* data, the Department argues that those companies did not raise this argument at the administrative level and therefore failed to exhaust their administrative remedies.  *See* Def.'s Br. 20 (citations omitted).  Moreover, even if the court were to consider the issue, Commerce argues, it is within its power to use import data instead of domestic data when it explains the reasons for its decision.  *See* Def.'s Br. 20-21 (citing *Wuhan Bee Healthy Co. v. United States*, 29 CIT 587, 601, 374 F. Supp. 2d 1299, 1311 (2005)).  Finally, as to its decision not to use WTA import data from the HTS category "other salts of pure sodium chloride" as a surrogate value, the alternative proposed by Clearon and OxyChem, Commerce argues that its policy is to avoid using "overly broad HTS categories for surrogate values where a more product-specific surrogate value is available."  *See* Def.'s Br. 21 (citation omitted).

The court finds that the Department acted reasonably under the facts presented.  In its Issues and Decision Memorandum, Commerce explained that it relied on the ITC's investigation in *Rock Salt from Canada* for guidance concerning the different types of salt, salt usage, and salt mining, because "after a thorough examination of all of the evidence on the record," it considered this determination to be the most persuasive and informative information placed on the record by the parties.  *See* I&D Mem. at

Comment 2 (citations omitted).  *Rock Salt from Canada*, though not precisely on point, is instructive in several ways.

First, *Rock Salt from Canada* made clear that a "significant percentage" of rock salt shipped to the U.S. is used in the chemical industry for the manufacture of chlor-alkalis, of the type made by Jiheng.  I&D Mem. at Comment 2 (citations omitted).  Next, relying upon *Rock Salt from Canada*, Commerce noted that "solar salt" (meaning sea salt that is produced by solar evaporation) "has about the same purity and crystal size as rock salt."  *Id*. (footnote and quotation omitted).

Further, the court agrees with Commerce that the similarities in purity and crystal size not only supports the use of rock salt, but discourages reliance on the *Chemical Weekly* data for vacuum salt.  This is because "Jiheng demonstrat[ed] that it uses industrial grade sea salt, which is manufactured by allowing sea water to evaporate . . . ."  Def.'s Br. 19 (citations omitted).  On the other hand, vacuum salt undergoes "further processing" in order to be sold as "high purity" vacuum salt.  Def.'s Br. 19 (citing I&D Mem. at Comment 2).  Therefore, considering the differences and structural similarities of the proposed surrogate sources, it is apparent that rock salt represented the "best available information."  Moreover, although the court finds that the *Chemical Weekly* data was from a domestic source, which is typically preferable to import data, the court

"is mindful that Commerce does not have an unconditional preference for using domestic prices over import prices when valuing surrogates." *See Wuhan Bee Healthy Co.*, 29 CIT at 601, 374 F. Supp. 2d at 1311 (citation omitted). This should particularly be the case where, as here, other factors such as the similarities between the surrogate and the input actually used weigh in favor of the imported input.

Finally, the court notes that, by placing the domestic vacuum salt data (*Chemical Weekly*) on the record before Commerce and arguing that it should be used as a surrogate value, Clearon and OxyChem exhausted their administrative remedies, and thus this matter is properly before the court. *See Fabrique de Fer de Charleroi S.A. v. United States*, 25 CIT 741, 743, 155 F. Supp. 2d 801, 805 (2001) ("The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court."). Nonetheless, it was reasonable for Commerce to reject import data under HTS subheading 2501.00.90 covering "other salts of pure sodium chloride" because that category of imports was overbroad as it is a "basket" provision. *See* I&D Mem. at Comment 2. Citing to *Certain Preserved Mushrooms from the People's Republic of China*, the Department noted that it "does not prefer an overly broad HTS category where a more product-specific surrogate value is available." *See* I& D Mem. at Comment 2

(citing Certain Preserved Mushrooms from the PRC, 72 Fed. Reg. 44,827 (Dep't of Commerce Aug. 9, 2007)).

In addition, as Commerce points out, it would be improper to rely on this data because no party put "information [on the record] describing the type of salt included in the basket category." *Id.* As a result, while Commerce knew what was actually imported under HTS subheading 2501.00.20, it had no way of knowing what was imported under HTS subheading 2501.00.90. Thus, the Department reasonably relied on record evidence that WTA Indian import data included in HTS subheading 2501.00.20 for rock salt was more representative of Jiheng's reported input, and therefore more product-specific. *See* I&D Mem. at Comment 2; *Polyethylene Retail Carrier Bag Comm. v. United States*, 29 CIT 1418, 1443-44, Slip Op. 05-157 at 43 (2005) (not reported in the Federal Supplement) (stating that "Commerce recognized that import statistics based on a basket tariff category are inappropriate if a more representative alternate surrogate is available").

The Department made its decision based upon a reasoned review of the record evidence, considered the alternatives before it, and supported its determination with substantial evidence. As such, the court will not disturb Commerce's findings. *See Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 481, 59 F. Supp. 2d 1354, 1357 ("The

statute requires Commerce to use the best available information, but does not define that term.") (footnote omitted). Accordingly, the court sustains Commerce's surrogate value calculation for sea salt.


    D.  Surrogate Value for Steam Coal

Clearon and OxyChem object to the Department's selection of a surrogate value for steam coal.  As a surrogate, the Department used domestic Indian price data from the Tata Energy Research Institute's Energy Data Directory and Yearbook (the "TERI data") from Coal India Ltd., the state-owned producer of coal in India. *See* Def.'s Br. 5.  Commerce's choice rested on its conclusion that the TERI data were the most specific to Jiheng's actual reported coal input.  *See* I&D Mem. at Comment 7.  That is, Commerce determined that it would use the TERI data because Jiheng "provided the Department with information on the specific types of coal it uses and their UHV [("useful heat value")]," and the "TERI Data are categorized by major types of coal and UHV value whereas WTA import data are listed under 'steam coal' without further specificity."  *Id.* (footnote omitted).

Clearon and OxyChem, however, insist that the Department used the TERI data only because it has used it in other reviews, and it never "actually analyz[ed] the implication of new factual information and arguments presented for the first time in the

context of this review." Clearon/OxyChem Br. 25. Clearon and

OxyChem primarily argue that they have placed on the record

evidence that the steam coal prices included in the TERI data

were available only to certain "core sector" purchasers,[11] a

group they allege does not include chemical producers like

Jiheng.

Clearon and OxyChem further argue that non-"core sector"

purchasers generally purchase coal through auctions "in which

prices routinely exceeded the listed prices in the TERI data by

50% or more." Clearon/OxyChem Br. 10. To support this claim,

Clearon and OxyChem cite record evidence including two Internet

news articles (one from "The Hindu Business Line"[12] and one from

---

[11]    According to Clearon and OxyChem, "[t]he industries classified as 'core sector' consumers of coal are power, defense, railway, fertilizer, metallurgic, cement, aluminum, and paper." Clearon/OxyChem Br. 10 (citation omitted).

[12]    This article noted that the Supreme Court of India had recently held that "[t]he differential pricing of coal that was being practised by [Coal India Ltd.] through the e-auction system violated the right to equality guaranteed in the Constitution . . . ." BioLab Inc.'s Submission of Factor Value Data dated Aug. 6 2007, PR 606 at Ex. 3. It went on:

> [W]hile core sector consumers like power
> plants, cement and steel manufacturers
> continued to receive coal supplies at the
> Government notified prices, non-core sector
> consumers ended up paying much higher prices
> as the base price for each auction was being
> fixed by the coal companies based on the
> highest realisation in the previous auction.
> There had been several occasions when buyers
> had to pay anywhere between 30 to 50 per cent

(continued...)

an indecipherable source[13]), which they insist demonstrate

inequality in coal availability at TERI data prices.  *See*

Clearon/OxyChem Br. 26 (citations omitted).  Thus, they argue

that Commerce failed to choose the surrogate value that most

"accurately reflects the coal consumption pattern of producers in

the relevant industry."  *See* Clearon/OxyChem Br. 10 (quotations

omitted).  Given their insistence that the prices represented by

the TERI data would not be available to Jiheng, Clearon and

OxyChem argue that the WTA import data necessarily represented

the best available information for valuing steam coal.  *See*

Clearon/OxyChem Br. 25.

The Department argues in response that it properly used the

---

[12](...continued)
> more than the notified prices, sources said.

> The customers in the non-core sector are of
> three types – linked customers, non-linked
> customers, and small and tiny industries.

*Id.*

[13]    The second article, entitled "Glitches in coal e-auction," also discusses the Supreme Court's decision. Curiously, this article contains the following sentence: "The entry of these coal guzzlers [referring to certain Indian companies mentioned earlier in the article] in the core sector like power, steel *and chemicals* boosted the price of coal, [and] endangered the existence of small players." BioLab Inc.'s Submission of Factual Info. dated Dec. 15, 2006, PR 480 at Ex. 2 (emphasis added). This seems to imply that chemical companies, like Jiheng, may be considered "core sector" consumers. At the very least, the article is ambiguous as to whether chemical companies are in the "core sector."

TERI data to calculate the surrogate value for steam coal because it was the most representative data of Jiheng's reported coal input.  That is, comparing the UHV of coal in the TERI data to that actually used by Jiheng, Commerce concluded that the TERI data was the "best available information" for valuing steam coal. *See* Def.'s Br. 23 (citing I&D Mem. at Comment 7).

In addition, Commerce insists that there is no conclusive record evidence to substantiate the claim that only "core sector" consumers could take advantage of the TERI data prices.  Def.'s Br. 23.  The Department explains:

> Although Clearon cites evidence of non-core sectors paying higher prices for the coal, the evidence cited does not specify the type of coal available at these prices.  Without such evidence, Commerce could not determine whether the type of coal being sold at these elevated prices was the type used by Jiheng. By contrast the Coal India Ltd. documents clearly specified that the type of coal used by Jiheng had been deregulated in 1996 and has been sold at market prices since 2000. Thus, Commerce chose to use the TERI data to value steam coal, because there was no evidence that the prices for the type of coal used by Jiheng were distorted or non-market.

Def.'s Br. 24 (internal citation omitted).  Based on the assertion that the type of coal used by Jiheng was available to all purchasers and its finding that coal prices in the TERI data were representative of Jiheng's reported input, the Department maintains that this surrogate price is the best available information.

The court finds that Commerce acted reasonably in using the TERI data to value steam coal.  Commerce explained that Jiheng provided it "with information on the specific types of coal it uses and their UHV."  I&D Mem. at Comment 7.  The Department further observed that "TERI Data are categorized by major types of coal and UHV value whereas WTA import data are listed under 'steam coal' without further specificity."  *Id*.  Thus, for Commerce, examining the information placed on the record, the TERI data was the most "product specific" surrogate available, and therefore the most representative of Jiheng's actual coal input.  Def.'s Br. 23.  This was reasonable under the facts of this case.

Furthermore, the court finds that Commerce supported its determination with substantial evidence and adequately explained the manner by which it reached its result.  Thus, to address Clearon and OxyChem's arguments about the limitations of the TERI data, Commerce's Issues and Decision Memorandum notes that Jiheng has provided it with Coal India, Ltd. documents stating that the Government of India has deregulated the price of steam coal used by Jiheng.  *See* I&D Mem. at Comment 7; Prelim. Results Surrogate Value Mem., PR 94, at Att. III (Dep't of Commerce July 2, 2007).  Specifically, the evidence revealed that deregulation occurred in 1996 and that the coal used by Jiheng has been sold at market prices since 2000.  *See* Prelim. Results Surrogate Value Mem., PR

94, at Att. III (Dep't of Commerce July 2, 2007) (noting that, effective January 1, 2000, Coal India, Ltd. "was free to fix the prices of such grades of coal in relation to the market prices"). As to Clearon and OxyChem's claims that certain articles support its contention that only "core sector" purchasers may buy coal from Coal India, Ltd. and that non-"core sector" purchasers pay more, one article is at best equivocal on this question (noting that "customers in the non-core sector are of three types – linked customers, non-linked customers, and small and tiny industries"), while the other article appears to support Commerce's position (referencing companies being "in the core sector like power, steel and *chemicals* . . . ."). *See* BioLab Inc.'s Submission of Factor Value Data dated Aug. 6 2007, PR 606 at Ex. 3; BioLab Inc.'s Submission of Factual Info. dated Dec. 15, 2006, PR 480 at Ex. 2 (emphasis added).

Additionally, to further justify its reliance on the TERI data as a surrogate value for a chemical producer such as Jiheng, Commerce cited its recent determination in *Saccharin from the PRC*, 72 Fed. Reg. 51,800 (Dep't of Commerce Sept. 11, 2007) (final results of the 2005-2006 antidumping duty administrative review) ("*Saccharin*"). In *Saccharin*, the Department found the TERI data to be a more appropriate surrogate to value steam coal than Indian WTA data. *See* Issues and Decision Mem. for the 2005-2006 Admin. Review of the Antidumping Duty Order on

Saccharin from the PRC, at Comment 3 (Dep't of Commerce Sept. 11, 2007).  The Department noted that saccharin is a chemical and the POR in the *Saccharin* investigation overlapped with eleven of the twelve months of the POR here.  *See* I&D Mem. at Comment 7.  In other words, although the *Saccharin* investigation did not explicitly address the "core" versus non-"core" distinction, Commerce reasoned that, given that saccharin is a chemical, the *Saccharin* determination is further evidence that the coal represented by the TERI data was available to chemical producers such as Jiheng during the POR.

The court finds that the evidence cited by Commerce meets the substantial evidence test.  Put another way, the Department has shown that: (1) the TERI data represents most closely the coal actually used by Jiheng, and (2) Clearon and OxyChem's claim that TERI data prices were unavailable to chemical manufacturers like Jiheng is, at best, subject to conflicting interpretations of the record evidence.  *See Technoimportexport, ECF Am. Inc. v. United States*, 16 CIT, 13, 18, 783 F. Supp. 1401, 1406 (1992) ("When Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly.").  Accordingly, the court finds the Department's explanation to be reasonable and sustains Commerce's surrogate value calculation for steam coal.

CONCLUSION

For the reasons stated, Commerce's Final Results of administrative review are sustained in part and remanded.  In light of the ordered remand, the court has not separately addressed Jiheng's claimed by-product offset for recovered sulfuric acid.  On remand, the Department shall reexamine each of Jiheng's claimed by-product offsets consistent with the instructions herein.  Remand results are due on or before October 12, 2009.  Comments to the remand results are due on or before November 11, 2009.  Replies to such comments are due on or before November 25, 2009.

                                        /s/Richard K. Eaton
                                         Richard K. Eaton

Dated:     July 13, 2009
           New York, New York